[Civ. No. 25644. Second Dist., Div. Two. May 9, 1962.]

OTTO M. BALLING, Plaintiff and Respondent, v. ORAL FINCH, Defendant and Appellant.

Kolts & Kolts for Defendant and Appellant.

Ellis D. Reiter and Robert J. Sullivan for Plaintiff and Respondent.

FOX, P. J.—Defendant Finch appeals from an adverse summary judgment.

The complaint is on a promissory note signed by Finch,

John Basso[1] and Fred H. Laurans.[2] In his answer Finch admitted the execution of the note but alleged four affirmative defenses. On this appeal, however, we need consider only the facts in the affidavits dealing with appellant's defense on the theory of duress and intimidation on the part of plaintiff.

Plaintiff filed a motion to strike the answer and for summary judgment. His motion was supported by two affidavits, one by himself and the other by his counsel. Opposition affidavits were filed by the defendants, Finch and Basso, and Robert F. Jonas.[3] Following a hearing, the motion to strike was granted and judgment in favor of the plaintiff as prayed summarily granted against defendant Finch. It is from this judgment that Finch appeals.

It appears that in the early part of June 1958 plaintiff Balling and defendants Basso and Laurans were interested in forming a corporation by the name of "Automatic Parking Corporation" and in obtaining a permit to issue certain of its stock for sale to the general public and as promotional shares to be divided among themselves. Finch, who is an attorney, was employed to handle the organization and incorporation of the new concern and later became its president.

On June 3, 1958, plaintiff delivered his check to Finch, payable to his order, in the amount of $1,000. On the face of the check in the left hand corner are these words: "Corp. Stock per agreement." Finch delivered a receipt on his letterhead to plaintiff, the material portion of which read: "June 3, 1958. Received of Otto M. Balling, . . . the sum of $1,000.00. Otto M. Balling is to receive for this sum $1,000.00 market value of common stock when issued and an equal number of shares of promotional stock when issued." This receipt was signed by Finch. On the lower left corner of this document were these words: "Automatic Parking Corp." Thereafter, on July 31, plaintiff delivered to Finch a check signed by plaintiff's wife for $1,000. On its face were these words: "Automatic Parking Corp. stock———." Finch delivered to plaintiff a signed receipt which also provided, as did the one previously issued to him, that he was to have both common and promotional stock when issued. The total of these and other checks given to Finch by plaintiff was $4,140. During

---

[1] Basso, who was secretary and treasurer of the corporation, defaulted.

[2] Laurans, who was the only paid employee of the corporation, was not served.

[3] Jonas was also one of the promoters of the corporation.

this period Finch prepared and filed articles of incorporation for Automatic Parking Corporation and prepared and filed the original application for permit to issue stock.

Some time prior to August 1959 plaintiff consulted his attorney, Ellis D. Reiter, and related to him these transactions. Mr. Reiter advised plaintiff that the money was returnable but that before taking any legal action, an effort should be made to settle the matter.

During the early part of August, Basso[4] and Laurans had a conference with Finch and advised him that plaintiff wanted his money back and had made threats to go to the Corporation Commissioner and the district attorney unless his money was returned to him, and had told them that his attorney had advised him that the receipt given him by Finch, promising him common and promotional stock, when such was issued, was a violation of law. The Jonas[5] affidavit was along the same line.

Some time thereafter, according to Finch's affidavit, Reiter in a telephone conversation with him, stated that "in his opinion there had been a violation of the Corporate Securities Act and that affiant [Finch] was guilty of such violation and that . . . unless a note was executed by affiant [Finch], Basso and Laurans, that the Corporation Commissioner would be advised of the transaction between the corporation and Balling and that Balling might even go and see the District Attorney about the matter."

Plaintiff denied having stated he would consult the Corporation Commissioner in an effort to prevent the issuance of a permit to sell the stock of the corporation unless his money was returned. Plaintiff's attorney denied telling Finch that he would advise plaintiff to take the matter before the Corporation Commissioner and the district attorney in order to get his money back since he believed there had been a violation of the Corporate Securities laws. He also denied stating to Finch that he would consult with either of these officials.

About this time the corporation retained Thomas J. Kelley,

[4]Basso, in his affidavit, stated, *inter alia*, that plaintiff told him (a) "that he and the other parties and promoters in the corporation had better get the money to pay Balling or they would be in trouble"; and (b) that "Balling further said, 'If I don't get my money back, I am going to tell my lawyer to go see the District Attorney.' "

[5]In his affidavit, Jonas stated that Balling said (a) "I will make sure I get it [his money] because if I don't, I will go to the District Attorney and get Finch's license if he doesn't dig up my money"; and (b) "My lawyer told me they would pay me or go to jail."

an attorney who had had substantial experience in handling matters before the Corporation Commission, to prepare an amendment to the application of Automatic Parking Corporation for a permit to issue stock. It was understood, however, that Finch rather than Kelley was representing the corporation in the Balling matter.

Finch and Kelley conferred about the matters here involved. Kelley advised Finch that in his opinion there had been a violation of the Corporate Securities Act. He also told Finch he did not want the corporate financial statement to show that the corporation owed money to anyone as this might jeopardize securing the permit.

Thereafter, as a result of conferences between the various attorneys, the matter was settled by paying plaintiff $750 in cash and giving him a promissory note for $3,390 here sued upon, executed by each of the defendants. The note, according to Finch's affidavit, was presented to him for his signature by Laurans. Finch stated that he believed that if he did not sign the note the Corporation Commissioner would not issue the amended permit for the corporation to issue stock and also that he "felt that there was a possibility of a criminal investigation which would be embarrassing to affiant [Finch] although he was an innocent victim of any wrong doing."

Upon the delivery of the money and note to plaintiff's counsel, plaintiff executed a release discharging Automatic Parking Corporation from any and all claims against said corporation including the right to participate in any of its assets. This release was delivered to Kelley who was then in a position to file a financial statement of Automatic Parking Corporation with the Corporation Commissioner showing no indebtedness on the part of the corporation.

The issue to be determined by the trial court on a motion for summary judgment is "whether or not defendant has presented any facts which give rise to a triable issue or defense, and not to pass upon or determine the issue itself, that is, the true facts in the case." (*Eagle Oil & Ref. Co., Inc.* v. *Prentice,* 19 Cal.2d 553, 555 [122 P.2d 264]; *Herbert* v. *Delphia,* 189 Cal.App.2d 485, 489 [11 Cal.Rptr. 353].)

Whether there exists a genuine issue as to any material fact must be determined from the affidavits. (*Cone* v. *Union Oil Co.,* 129 Cal.App.2d 558, 563 [277 P.2d 464]; *Coyne* v. *Kremples,* 36 Cal.2d 257, 263 [223 P.2d 244].) In considering the affidavits, the rule is that "the facts stated in

the affidavits opposing the motion must be accepted as true, that such affidavits must be liberally construed and need not necessarily be composed wholly of strictly evidentiary facts, and that those of the moving party must be strictly construed." (*Buffalo Arms, Inc.* v. *Remler Co.*, 179 Cal.App.2d 700, 703 [4 Cal.Rptr. 103] ; *J. C. Wattenbarger & Sons* v. *Sanders,* 191 Cal.App.2d 857, 864-865 [13 Cal.Rptr. 92].)

It is clear that the affidavits do present a factual issue; viz., did plaintiff make the threats attributed to him? Since we must accept the statement of facts in appellant's affidavits as true it follows that this question must be answered in the affirmative. The basic question then is whether the threats made by plaintiff may constitute a defense to this action on the promissory note. We have concluded this question must also be answered in the affirmative.

The guiding principles here applicable are set forth in *Lewis* v. *Fahn,* 113 Cal.App.2d 95, 98-100· [247 P.2d 831], in approved quotations from American Jurisprudence and Corpus Juris Secundum :

"Anciently, duress in law by putting in fear could exist only where there was such a threat of danger to the object of it as was deemed sufficient to deprive a constant or courageous man of his free will, and the circumstances requisite to that condition were distinctly fixed by law. That is to say, the resisting power which every person was bound to exercise for his own protection was measured, not by the standard of the individual affected, but by the standard of a man of courage; and those things which could overcome a person, assuming that he was a prudent and constant man, were not left to be determined as facts in the particular case, but were a part of the law itself.

". . . . . . . . . . .

". . . [D]uress is still often defined as that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind and will of a person of ordinary firmness. By many if not most of the modern authorities, however, the true doctrine of duress is held to be that a contract, deed, or any obligation obtained by so oppressing a person by threats regarding the safety or liberty of himself, or of his property, or of a member of his family, as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the ground of duress, whether the oppression causing the

incompetence to act be produced by what was formerly deemed duress, and relievable at law as such, or wrongful compulsion remediable only by an appeal to a court of equity.

"...........

"There is no legal standard of resistance with which the person acted upon must comply at the peril of being remediless for a wrong done to him, and no general rule as to the sufficiency of facts to produce duress. The question in each case, Was the person so acted upon by threats of the person claiming the benefit of the contract, for the purpose of obtaining such contract, as to be bereft of the quality of mind essential to the making of a contract, and was the contract thereby obtained? *Hence, under this theory duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim. The means used to produce that condition, the age, sex, state of health, and mental characteristics of the alleged injured party, are all evidentiary, merely, of the ultimate fact in issue, of whether such person was bereft of the free exercise of his will power. Obviously what will accomplish this result cannot justly be tested by any other standard than that of the particular person acted upon. His resisting power, under all the circumstances of the situation, and not any arbitrary standard, is to be considered in determining whether there was duress.*" (Emphasis by the court.) (17 Am.Jur., Duress and Undue Influence, pp. 882-885.)

"Under the modern doctrine there is no standard of courage or firmness with which the victim of duress must comply at the risk of being without remedy; the question is merely whether the pressure applied did in fact so far affect the individual concerned as to deprive him of contractual volition; if it did there is duress, if it did not there is none." (17 C.J.S., Contracts, § 175 (headnote) p. 533.) The court then said (p. 100) : "A reading of the California cases of later vintage leads us to believe that the relaxed and modern rule of the subjective test of duress as stated in the foregoing quotations from American Jurisprudence and Corpus Juris Secundum is the controlling rule in California and particularly is this so we think in respect to that form of duress with which we are here concerned and which has sometimes been termed 'illegal business compulsion.' " (*Cf. Furnish* v. *Commissioner of Internal Revenue*, 262 F.2d 727.)

Applying these principles to the threats made by plaintiff against Finch, and taking into account the fact that

420

he is a professional man and that his professional reputation is a tremendously important factor in the successful pursuit of his profession, and the great harm that could come to him by reports either to the Corporation Commissioner or the district attorney that he had been guilty of violating the Corporate Securities law, and particularly if either of these officials should start an investigation which became public—all these considerations might well have so acted upon Finch's mind that he was ''bereft of the free exercise of his will power'' and did not at the time he signed the note possess ''the quality of mind essential to the making of a contract.'' Whether plaintiff's statements produced such a condition on Finch's mind was a question of fact. If it did plaintiff was guilty of duress and Finch has a good defense to the note. (*Shasta Water Co.* v. *Croke,* 128 Cal.App.2d 760 [276 P.2d 88].)

In this last case the court said (p. 764): ''The cases cited show that an agreement obtained through threat of criminal prosecution is void, even if the amount agreed to be paid was due, because the use of criminal prosecution as a means of collecting a debt is against public policy; such threats, like all threats of injury to the character of the party, constitute menace destructive of free consent. (Civ. Code, §§ 1567-1570.)''

It cannot be said that the statements made by plaintiff could have no effect, as a matter of law, on ''the state of mind induced thereby in the victim.'' It therefore follows that we have in the case at bench a factual question that cannot be decided on affidavits in a summary judgment proceeding.

Plaintiff seeks to exclude proof of the statements he made to Basso and Jonas on the theory they are hearsay. He fails to recognize that his statements are admissible under an exception to the hearsay rule. The principle is stated thus in *People* v. *Henry,* 86 Cal.App.2d 785, 789 [195 P.2d 478]: ''There is a well-established exception or departure from the hearsay rule applying to cases in which the very fact in controversy is whether certain things were said or done and not as to whether these things were true or false, and in these cases the words or acts are admissible not as hearsay, but as original evidence. [Citations.]'' Here there was an issue as to whether the statements attributed to plaintiff by Basso and Jonas were in fact made by him. These statements were admissible for the purpose of showing that they were made by him—not for the purpose of establishing

the truth of any matter that may be asserted therein. There is therefore no hearsay problem involved. (6 Wigmore on Evidence (3d ed.) § 1770, p. 185; McCormick on Evidence (1954) p. 463.)

The judgment is reversed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied June 4, 1962, and respondent's petition for a hearing by the Supreme Court was denied July 3, 1962.