[Civ. No. 46358. Second Dist., Div. Five. Apr. 27, 1976.]

In re the Marriage of VIRGINIA THORPE
and THOMAS P. GONZALEZ.
VIRGINIA THORPE GONZALEZ, Respondent, v.
THOMAS P. GONZALEZ, Appellant.

**COUNSEL**

Kadison, Pfaelzer, Woodard, Quinn & Rossi, Morris Pfaelzer, William Vetter and Margaret M. Morrow for Appellant.

Paùl Caruso, Robert V. Madden and James Alle for Respondent.

**OPINION**

**HASTINGS, J.**—Thomas P. Gonzalez (husband) seeks review of a judgment and an order made during the course of a dissolution of marriage proceeding initiated against him by Virginia Thorpe Gonzalez (wife). The judgment set aside the marital settlement agreement (agreement) executed by the parties on August 25, 1970, on the grounds that it

had been signed by wife as a result of duress, mistake of fact, and mistake of law. The order directed that husband pay on account of services already rendered and services to be rendered in connection with a prospective trial of the property rights of the parties, $9,832.17 in attorney's fees and accountant's fees and costs on behalf of wife.

Wife filed her petition for dissolution of marriage on January 16, 1970. Her first attorney subsequently took husband's deposition, employed accountants to examine the books and records of husband's business, the Thos. P. Gonzalez Corporation (corporation), and examined the records of husband and his business at the offices of the Crocker-Citizens National Bank. Approximately four months after filing her petition, wife substituted in another firm of attorneys, and again one month later substituted in a third attorney who represented her until after she signed the agreement. Wife's third counsel found that discovery to date was incomplete, and that numerous aspects of the issues involved therein remained unanswered. However, the court found that during the time he was employed as wife's counsel (June 3 to August 25, 1970), he conducted no further discovery.

The agreement provided with certain exceptions that all property interests of the parties were the separate property of husband, whether previously held in his name alone or in the name of wife alone. Husband was required to pay to wife $1,500 spousal support per month, and an additional $100 per month for each child living with her and under the age of 21,[1] and $3,000 outright upon signing of the agreement. Husband was further required to pay any tuition incurred at private educational institutions on behalf of the children as well as their major medical expenses. Finally, husband was to acquire for an amount to not exceed $100,000 a home for wife and the children in a suitable residential area, and to assume the responsibility for the payment of real property taxes, interest and amortization, fire insurance, and the cost of any structural maintenance.[2]

On November 19, 1970, wife substituted Harvey Himmel as her attorney, and on November 23, 1970, she filed a notice of rescission of the agreement, alleging numerous grounds.

[1]The parties were awarded joint custody of the children, with physical custody to wife.
[2]Specifically, the agreement provided that wife quitclaim to husband:
1. The family residence located at 362 Copa de Oro Drive, Bel Air, California, although title to same stood in her name alone as her sole and separate property.
2. All the shares of the Thomas P. Gonzalez Corporation in wife's or husband's name,

On February 12, 1974, wife substituted the law offices of Paul Caruso (Caruso) in place of Harvey Himmel, and the trial re the validity of the agreement was held on August 1 and 2, 1974 in the Superior Court of Los Angeles. After hearing testimony and receiving evidence, the trial court ruled in favor of wife and ordered the agreement null and void. The trial court made extensive findings.[3] In essence, they found that husband threatened and intimidated wife that unless she signed the agreement she would lose the children, by husband's use of legal or illegal means, and that she would find herself in the street with nothing. Wife was found to

---

although 500 shares of same stood solely in her name.

3. Certain real property and improvements located at 1960 South Santa Fe Avenue, Los Angeles, California, although title to said property was held in joint tenancy.

4. All stock of Cathay Bank and Texas Commodities Company.

5. Two Certificates of Deposit in the face amounts of $310,616.67 and $105,114.02, respectively, at Crocker-Citizens National Bank.

6. A promissory note of the Thomas P. Gonzalez Corporation in the face amount of $206,624.52 made payable to husband.

7. All life insurance policies.

8. All personal bank accounts, except those in wife's name alone.

9. All motor vehicles in the name of husband.

10. All contents of a residence located at 703 Pacific Coast Highway, Santa Monica, California.

11. Collection of gold coins and bars.

12. All personal effects of husband.

In return, wife, under the provisions of the agreement, was to receive as her sole and separate property:

1. Personal effects in her possession.

2. Furniture and furnishings in the family residence.

3. All bank accounts in her name alone.

4. A 1970 Mercury station wagon.

[3]We repeat the substance of the trial court's findings pertinent to this opinion.

1. Husband, a Mexican national and not a citizen of the United States, threatened wife, on four or five separate occasions, that unless she executed a Marital Settlement Agreement on his terms, he would remove the minor children of the parties to Mexico and she would never see them again.

2. Husband threatened and intimidated wife, on four or five separate occasions, that unless she executed an agreement on his terms, he would see that she found herself in the street with nothing.

3. Husband threatened and intimidated wife, on four or five separate occasions, that unless she executed an agreement on his terms, he would not consent to a dissolution of their marriage.

4. Husband threatened and intimidated wife, on one occasion, by informing her that his Mexican friends had advised him that he should have her exterminated and that such an act would rid him of his problems.

5. Husband, on four or five separate occasions, threatened wife that unless she executed an agreement on his terms, he would take custody of the minor children away from her.

6. During the entire time that wife's counsel represented her, he found her to be very emotional and fearful of husband.

7. During the week prior to the execution of the agreement, wife's counsel believed her to be under great emotional stress and "pretty upset" over whether or not to settle on

be under great emotional stress and fearful of husband while negotiations were underway, and she signed the agreement when she was extremely distraught.

The conclusions of law (paraphrased) simply state that wife signed the agreement under duress, coercion, mistake of law and mistake of fact.

At the conclusion of the trial, Caruso requested attorney's fees and costs, and after submission of the issue the trial court ordered the fees and costs in the amount stated earlier.

## HUSBAND'S CONTENTIONS ON APPEAL

1. Should a woman who began an investigation of the nature of the parties' property, which she never completed, who spoke with her husband only four to five times during the period prior to her signing, and who was at all relevant times represented by independent counsel, now be allowed to rescind an executed marital settlement agreement by claiming duress, mistake of fact, and mistake of law?

2. Should an award of attorneys', accountants' and appraisers' fees and costs be allowed to stand where the trial court had before it no evidence demonstrating either the wife's financial need or the nature and reasonableness of the services performed, and where it apparently failed to consider the evidence presented to it concerning the posture of the litigation, the amount of fees previously paid by the husband and his current financial position?

## DISPOSITION

Husband argues that the trial court erred on numerous issues. Inasmuch as we affirm the judgment because the record clearly supports rescission of the agreement on the ground of duress, we set forth only his contentions on this issue.

---

the terms and conditions proposed by husband.

8. On August 24, 1970, wife's counsel found wife to be emotionally upset.

9. On August 25, 1970, wife executed the agreement at a time when she was "extremely distraught."

10. Wife was unaware, and uninformed by her counsel, of the legal significance and of her legal rights in and to the property acquired by the parties.

He first argues that he did nothing that approximates duress as defined in Civil Code section 1569[4] because wife was not confined unlawfully or against her will, nor was her property unlawfully detained. Indeed, he states, the facts belie such a conclusion because (1) he and wife, at all times following the institution of divorce proceedings, lived separate and apart and there was no unlawful detention of her property[5] and (2) the essence of duress is unlawful action and his threats to exercise his legal rights did not meet this criterion. (Citing *London Homes, Inc.* v. *Korn,* 234 Cal.App.2d 233, 239-240 [44 Cal.Rptr. 262]; *Konecko* v. *Konecko,* 164 Cal.App.2d 249, 252 [330 P.2d 393], and *Yost* v. *Yost,* 116 Cal.App.2d 572, 578 [253 P.2d 696].)

■ ■ Husband's interpretation of duress as defined by section 1569 is much too limited and does not take into consideration decisional law that has interpreted its language to apply to facts similar to this case. Actual confinement of a person or his property, as argued by husband, is not required. Menace is (1) a threat of unlawful confinement of the persons specified in the section, (2) a threat of unlawful and violent injury to the person or property of any such person. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 339, p. 287.) And an unlawful act, to constitute duress, may be either a tort or a crime. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 337, p. 284.) ■ Husband's acts fall within both categories, and the decisional concept of duress. Several cases outline the acts of a party that constitute duress sufficient for rescission of a contract. In *Balling* v. *Finch,* 203 Cal.App.2d 413 [21 Cal.Rptr. 490], the court, beginning on page 418, adopted the following language from *Lewis* v. *Fahn,* 113 Cal.App.2d 95, 99 [247 P.2d 831]:

" 'By many if not most of the modern authorities, however, the true doctrine of duress is held to be that a contract . . . obtained by so

---

[4]Civil Code section 1569 provides in pertinent part as follows:
"Duress consists in:
"1. Unlawful confinement of the person of the party . . .
"2. Unlawful detention of the property of any such person; or
"3. Confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly harassing or oppressive."

[5]Husband also places great emphasis on the fact that wife was always represented by counsel and argues that if rescission of the agreement is permitted, parties engaged in dissolution proceedings will become, in effect, insurers of the quality of representation being received by their spouses. The illegal and tortious threats were made by husband to wife when counsel were not present. The record does not establish that wife's counsel was able to allay her fears caused by the threats. Acceptance of husband's argument cannot stand as a matter of law because it would condone such conduct simply because the parties were represented by counsel.

oppressing a person by threats regarding the safety or liberty of himself, or of his property, or of a member of his family, as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the ground of duress. . . .

"There is no legal standard of resistance with which the person acted upon must comply at the peril of being remediless for a wrong done to him, and no general rule as to the sufficiency of facts to produce duress. The question in each case [is], Was the person so acted upon by threats of the person claiming the benefit of the contract, for the purpose of obtaining such contract, as to be bereft of the quality of mind essential to the making of a contract, and was the contract thereby obtained? *Hence, under this theory duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim. The means used to produce that condition, the age, sex, state of health, and mental characteristics of the alleged injured party, are all evidentiary, merely, of the ultimate fact in issue, of whether such person was bereft of the free exercise of his will power. Obviously what will accomplish this result cannot justly be tested by any other standard than that of the particular person acted upon. His resisting power, under all the circumstances of the situation, and not any arbitrary standard, is to be considered in determining whether there was duress.'* (Emphasis by the court.) (17 Am.Jur., Duress and Undue Influence, pp. 882-885.)"

And in *Gross* v. *Needham,* 184 Cal.App.2d 446, on page 461 [7 Cal.Rptr. 664], the court states: "Duress, which includes whatever destroys one's free agency and constrains him to do what is against his will, may be exercised by threats, importunity or any species of mental coercion (9 Cal.Jur.2d, Cancellation of Instruments, § 16.) June [wife] testified about an argument immediately preceding the execution of the instrument; according to her testimony, Dan [husband] stated: 'Well, the time's getting short now and I'm tired of arguing over it, something is going to be done today, and I mean now.'; later during this same argument which lasted from three o'clock until five or five-thirty, Dan declared: 'We've only got about an hour or half hour left and it's getting close for that notary to close . . . You are going to have to sign today because Monday morning you won't have anything. You'd better make up your mind whether you are going to lose it or whether you are going to sign this paper or lose your property.' The words and conduct above set forth clearly come within the framework of the authority heretofore cited."

Before reviewing the facts of this case most favorable to wife, as we are required to do, we are constrained to repeat the rules on appeal that are so clearly tailored for this type of case. ■ The power of a reviewing court begins and ends with a determination of whether there is in the record substantial evidence, contradicted or uncontradicted, which supports the result reached; and we must also assume in favor of the determination below the existence of every fact which the trier of facts could have reasonably deduced from the evidence. (*Gross* v. *Needham, supra,* at p. 460.)

■ A summary of wife's testimony reveals four or five conversations between herself and husband concerning the agreement, prior to its execution.[6] (Husband concedes three conversations.) Wife detailed the

---

[6]Pertinent portions of wife's testimony are as follows:

"Q. Now, how many times did he discuss the agreement with you preceding the 25th day of August, 1970, approximately?

"A. Oh, approximately—I can't really remember but it was four or five times I believe.

"Q. And could you tell her Honor where these conversations took place?

"A. Over the telephone and once or twice at the house.

"Q. Will you tell us the best you recall the substance of these conversations with regard to the marital settlement agreement?

"A. Well, he said that he was never going to give me a divorce and that he was going to take the children to Mexico and that I would never see them again, and at that point I was totally Latinized and terrified and distraught, and at one time he was at the house and he said, 'Well, my friends in Mexico have advised me that I should have you exterminated and that would rid me of my problems', and—

"Q. Were these conversations with respect to the marital settlement agreement and your signature thereon?

"        .   .   .   .   .   .   .   .   .   .   .   .   .

"A. Yes. He told me that I'd better sign it, otherwise I was going to end up with nothing in the streets and that is where he wanted me, and I said to him, 'Well, we have been married eighteen years and we have five children and at least you should be fair and do the right thing,' and he said, 'I don't care,' he said, 'I want to see you in the street with nothing.'

"        .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Prior to your signing the agreement did Mr. Gonzalez ever tell you that unless you signed the agreement he would not give you the dissolution?

"A. Yes, that is right. . . .

"Q. Did he tell you if you did sign the agreement he would not contest your having custody of the children?

"A. That is right, he did.

"        .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Do you remember getting a check for $3,000?

"A. My main concern was keeping my children. I was very upset that day and distraught and I was worried about the custody-thing coming up.

"        .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. . . . presently you do not have any recollection of having executed a number of instruments while you were in [your counsel's] office that afternoon which conveyed

threats and her reaction to them, and ended her testimony with the statement: "I was extremely distraught and worried about the possibility of losing my children the next day, and I would have signed a pact with the Devil if I'd have had to to keep my children." Wife's counsel testified that "There was so much emotion and so many hassles . . . going on between Mr. and Mrs. Gonzalez all during this period of time," and "I think Mr. Gonzalez had a very strong influence over Mrs. Gonzalez."[7] In substance, these statements and husband's conduct are extremely more coercive than the cited threats held to be a form of duress in *Gross* v. *Needham, supra.* They become even more pertinent when we view them in relation to a portion of the test used in *Balling, supra,* where the court considers the state of mind and mental characteristics of the injured party when the contract is signed. The testimony of her own attorney corroborated wife's emotional stress and the fact that husband had a very strong influence over her.

(2) Husband's principal argument is, however, that the above evidence merely established that wife signed the agreement because *she* wanted to avoid the custody hearing which husband and his attorneys, acting within their legal rights, had scheduled, and this is simply a classic example of a threat to institute suit on the basis of a good faith belief in one's claim, which is not duress. Accordingly, husband obtained the agreement he wanted and wife retained what she wanted most—the children. To buttress this *quid pro quo* theory, husband states that the court specifically found wife was willing to sign or agree to anything in order to avoid the custody hearing, and this finding in and of itself negates any inference that she was induced by unlawful threats to sign the agreement. Our first response is that there is no specific finding that is so worded. There were 80 different findings and the three nearest in context merely found that husband told his attorneys that wife was willing to sign to avoid going to court on the custody matter, and wife's counsel had informed them wife was in a "horse-trading" mood for the

---

various properties, property interests, to Mr. Gonzalez?

"A. No. I was extremely distraught and worried about the possibility of losing my children the next day, and I would have signed a pact with the Devil if I'd have had to to keep my children.

"I don't recall that, I don't recall those. I recognize the property settlement but I truthfully, honestly, don't recall signing that. . . ."

[7] Wife's counsel, in response to the question "Did she relate to you any threats allegedly made by Mr. Gonzalez?" testified ". . . I don't recall specifically at that point in time that she told me that Mr. Gonzalez had threatened her life, no. . . ."

same reason.[8] They do not, as a matter of law, negate any inference of duress. And, more importantly, there are other findings that support the conclusion that wife signed under duress and that her execution of the agreement was not just a trade-off of legal rights and obligations. Unquestionably, the trial court could have reasonably interpreted husband's threats as menacing statements that he would unlawfully take the children to Mexico so that she would never see them again unless she signed the agreement. Also that he was considering his friends' statements, and might carry them out when he said, "Well, my friends in Mexico have advised me that I should have you exterminated and that would rid me of my problems."[9] While it is true that wife was fearful of the hearing and its possible consequences, she could also have believed that if she won the custody battle in court, her triumph might trigger husband into carrying out his other threats.

■ Moreover, even if the illegal and tortious threats were absent, we reject the validity of husband's argument in this case. Stripped of all rhetoric and legal subtleties, he contends there can be no duress as a matter of law when a wife bargains away substantial property rights to protect her custody rights to the children. It is not, as husband claims, a classic example of a threat to use legal processes in order to settle a legal problem. The involvement of the children that automatically raises the issue of their welfare places this type of litigation in an arena of its own. The emotions and fears of the parties are more intense and are not comparable to litigants in a normal civil action. If threatened use of a

---

[8]The specific findings are:

"38. On 18 August 1970 Respondent informed his attorneys of record that Petitioner was willing to more or less sign or agree to anything in order to avoid going to court on 27 August 1970 and face the possibility of losing her children.

"39. On 18 August 1970 Respondent informed his attorneys of record that Petitioner was willing to accept Respondent's settlement offer if that is what it would take to eliminate the 27 August 1970 hearing, even though she believed Respondent's settlement to be unfair.

"40. On 18 August 1970 [wife's counsel] informed counsel for Respondent that Petitioner was in a 'horse-trading' mood in that she did not want to go to court on the custody matter."

[9]Husband's attorney, in arguing a motion for nonsuit on the grounds wife had not proved a prima facie case, referred to this statement and said: "When that evidence comes out it comes out in this form: She quotes Mr. Gonzalez as having said, 'Well, my friends in Mexico have advised me that I should have you exterminated and that would rid me of my problems.' [¶] Now, that is a very different kind of a statement than a statement that her husband has threatened her." We disagree. Wife was emotional and distraught, and she might not have been able to observe the alleged subtlety of the remark. Furthermore, it would be a convenient way to veil a threat in order to avoid its legal consequences.

custody hearing can cause so much fear in the mind of the responding parent that contractual volition is destroyed, the court is not required to legally recognize the agreement when equity demands otherwise. It is immaterial what we call it—duress, coercion, or compulsion (a term used in *Adams* v. *Adams*, 29 Cal.2d 621, 624 [177 P.2d 265]); the point is that the court will not permit its jurisdiction and processes to be used in a manner that defeats the ends of justice. Where, as here, the totality of the circumstances support the trial court's finding of duress, we will not reverse the decision unless a clear abuse of discretion is demonstrated. The facts of each case will vary substantially. We recognize it is a common practice to raise the issue of child custody in many, if not most, marriage dissolution actions. By this opinion we do not encourage a challenge of negotiated property settlement agreements where custody and property rights have been settled on an arm's-length basis. We are only referring to the exceptional case and emphasizing that husband's argument, alone, cannot stand as a matter of law.

2. Husband's second contention is that the award of attorney's and accountant's fees and costs was an abuse of discretion on the part of the trial court for several reasons. Numerically, each argument is as follows:

█ █ Husband argues that California Civil Code section 4370 provides that attorney's fees and costs pendente lite should be awarded only in such amounts as may be reasonably necessary for the cost of maintaining or defending the proceeding. He claims that at the order to show cause re attorney's fees and costs, wife presented no evidence that she was in need of funds to pay her attorneys. He apparently bases his argument on a statement of the judge made very early in this hearing that "The court file is not in evidence in this case." While it is true that the judge at the time of the OSC did not have the court file on the dissolution proceeding before him, it is clear from the record that this proceeding was just one of many protracted proceedings that arose out of the original petition filed by wife for dissolution of the marriage.[10] On August 20, 1974, wife did cause to be filed with the trial court a financial declaration which, among other things, addressed itself to a request for attorney's fees and costs from husband. The reporter's transcript of the OSC hearing reveals that the judge did not know at the time of his remark that this hearing could include attorney's fees for the rescission action because it arose out of the marriage dissolution proceeding. Later,

---

[10] Pursuant to rule 12(a) of California Rules of Court, we augmented the record on our own motion by ordering the superior court file to be filed with the record on appeal.

through his own questions, he clarified this issue. He took the matter under submission and we must assume he then reviewed the file. There is ample evidence in the file to demonstrate wife's need for attorney's fees and other appropriate costs up to the time of the hearing and in the future.

Further, husband did not raise this specific issue at the hearing, but only raised the propriety of ordering the fees prior to determination of the appeal which we discuss *infra.*

■ Husband argues that wife's attorney did not show that the services performed by him were "reasonably necessary" to the prosecution or maintenance of a dissolution action, citing *In re Marriage of Lopez,* 38 Cal.App.3d 93 [113 Cal.Rptr. 58]; *In re Marriage of Mulhern,* 29 Cal.App.3d 988 [106 Cal.Rptr. 78]; and *Straub* v. *Straub,* 213 Cal.App.2d 792 [29 Cal.Rptr. 183]. Wife's attorney (Caruso) testified that he recorded, in connection with this case, 152 hours exclusive of court time. The court time involved four appearances which included a two-day hearing to set aside the property settlement agreement. Wife's attorney was unable to differentiate the time expended in connection with the rescission phase of the case, and the time expended on other matters pertaining to the dissolution proceeding. The court record fully reflects the complex nature of the case and the enormous amount of time that has been rendered by the attorneys for both sides. *Smith* v. *Smith,* 1 Cal.App.3d 952, commencing on page 958 [82 Cal.Rptr. 282], summarizes the court's authority in awarding counsel fees. It states:
■ "The question of the reasonableness of the order for attorney's fees is addressed to the sound discretion of the trial court [citations], and in the absence of a clear showing of abuse its determination will not be disturbed on appeal. [Citations]. ' " 'Abuse of discretion is never presumed. It must be affirmatively established.
■ A reviewing court is not authorized to revise the lower court's judgment even if it should be of the opinion that it would have made a different award had the matter been submitted to its judgment in the first instance, in the absence of a clear abuse of discretion.' " ' [Citation.] 'The discretion was the trial judge's, not ours; and we can only interfere if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' [Citations.] . . . [¶] ■ It is settled that a judge may rely upon his own experience and knowledge of the law practice, as well as on the facts and circumstances of the case as they appear from pleadings and other papers. [Citations.] . . ."

■ ■ Finally, husband argues that fees should not have been awarded while the appeal was pending as there had been a previous award that should have covered the services rendered by wife's attorney up to and through the rescission action. It is true that a judge of the superior court in a previous order to show cause hearing, had stated: "The attorneys fees and accounting fees as set forth above are deemed to be in full payment for legal services and accounting services rendered to Petitioner [Mrs. Gonzalez] up to and including March 23, 1970, and are further intended to represent payment for attorneys fees and accounting fees to be rendered to Petitioner for all reasonably anticipated legal and accounting work up to, but not including, the time of trial."

The record indicates that the court was aware of this argument, and fully considered it, and determined in its discretion that wife's attorney was entitled to fees for services performed up to the date of the OSC hearing, plus fees for the future trial of the dissolution proceedings.[11] Clearly, it was within the court's discretion to award fees for the rescission action as well as for other services connected with the myriad of problems raised by the dissolution proceeding.

In conclusion, husband's attorneys argue the award was premature because the appeal on the rescission action had not yet been determined. They argue that, until such time as wife's attorney has successfully defended the rescission on appeal, the court was in no position to judge the good faith element of wife's action. In other words, if the appeal benefits wife and the rescission is upheld, then the court would better know how to award fees because it could also consider the successful result of the attorney's services. Furthermore, the fees awarded for the accountants were premature because, if husband prevails on appeal,

---

[11]The court on this point heard the following statement from husband's attorney, and responded as follows:

"[HUSBAND'S ATTORNEY]: . . . Judge Feinerman made an order back in 1970 that the fees that were then awarded were intended to cover all the proceedings up until this time.

"THE COURT: Did that include the rescission action?

"[HUSBAND'S ATTORNEY]: At the time the rescission action wasn't pending.

"THE COURT: That's not a fair thing to say, that it should include all the rescission action fees . . . Assuming there had been no change of counsel, it wouldn't have been fair to hold him to an order that was made without contemplating the rescission action. . . . I don't know what Judge Feinerman had in mind. [¶] I think the changing of counsel to the extent that it may be escalating attorney fees in an unwarranted fashion, they shouldn't be awarded, but I don't know that's the situation here, whether the changing of counsel has caused the attorney fees to be any higher than they would have been had there been no change of counsel."

there would be no need for further accounting investigations, inasmuch as the property settlement agreement awarded husband all of the property.

Again, the court took this argument into consideration as its order stated: "If the settlement agreement is hereafter declared valid, the Court reserves jurisdiction to hereafter order Petitioner to reimburse Respondent for all or any part of said fees as represent services in connection with the rescission of the agreement."

The present posture of this case is that wife has prevailed and this court has affirmed the judgment that holds the agreement is invalid. It is quite possible that this issue is moot; however, the trial court has reserved jurisdiction to make adjustments that it feels may be necessary.

We conclude that there has been no abuse of discretion, and the trial court's order on fees and costs is proper.

The judgment entered November 20, 1974, setting aside the marital settlement agreement, and the order entered August 30, 1974, are affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 1, 1976. Mosk, J., was of the opinion that the petition should be granted.