Filed 1/28/14  In re L.V. CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re L.V., a Person Coming Under the Juvenile Court Law. | D064325 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Appellant, | (Super. Ct. No. SJ012489) |
| v. | |
| A.H., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

Joanne Willis Newton, under appointment by the Court of Appeal, for Minor.

A.H. is the mother of L.V., who turned three years old in November 2013. The juvenile court entered judgment after it terminated parental rights; found that the exception to termination of parental rights under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i)[1] (the "continuing benefit exception"), did not apply; and ordered adoption as L.V.'s permanent plan.

The mother appeals, first arguing that the court erred when it summarily denied her section 388 petition when it found she had not met her burden to make a prima facie showing of changed circumstances. We conclude the court did not err because the mother did not present evidence of changed circumstances. She next argues that substantial evidence does not support the court's finding that the continuing benefit exception did not apply. We conclude that substantial evidence supports the court's findings and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *L.V.'s First Removal*

On January 7, 2011, the San Diego County Health and Human Services Agency (the Agency) took one-month-old L.V. into custody and filed a petition under section 300, subdivisions (b) and (g). The subdivision (b) count alleged the mother failed to protect L.V. when she left her with the maternal grandmother who had known substance abuse problems and who subsequently left L.V. in the care of two teenage relatives

---

1    All further statutory references are to the Welfare and Institutions Code.

2

overnight. The subdivision (g) count alleged the child had been left with no provision for support because the mother was incarcerated and unable to arrange for her care, and the whereabouts of the alleged father were unknown.[2]

The mother appeared at the detention hearing on January 11, 2011, while in custody. She had been arrested in December 2010 for being under the influence of a controlled substance, failure to appear, and violation of a restraining order. At the time of the detention hearing, the mother had been sentenced for the restraining order violation and was not scheduled to be released until the following month on February 22, 2011. During the course of the Agency's investigation, the mother reported an eight-year history of marijuana and methamphetamine use, beginning when she was 14 years old.

On February 1, 2011, the court held the jurisdiction and disposition hearing. The court found L.V. was described by section 300, subdivision (b) by clear and convincing evidence, that removal was necessary, and ordered L.V. placed in a licensed foster home. The court ordered the Agency to provide reunification services to the mother and ordered the mother to comply.

B.    *The Reunification Period*

The mother's court-ordered reunification plan included individual therapy, parenting education, a substance abuse treatment program, a 12-step program involving twice-weekly Narcotics Anonymous (NA) meetings, and random drug testing. At a

---

[2]    The father is not a part of this appeal.

special hearing on April 5, 2011, the court also ordered the mother into drug court and authorized a psychological evaluation if recommended by her therapist.

By the time of the six-month review hearing on July 26, 2011, L.V. had been diagnosed with several ongoing medical conditions and needs. L.V. was prescribed a specific type of formula for acid reflux, was under doctor's supervision for a hemangioma and a hernia, and was attending physical therapy sessions biweekly for hip dysplasia. She also needed surgery for a blocked tear duct.

The mother's supervised visits with L.V. went well in many respects except feeding. On May 3, 2011, the mother tried to give L.V. a different type of formula than what was prescribed. A social worker asked the mother not to feed the child a different kind of formula during visits, and the mother agreed. The mother subsequently fed L.V. the wrong kind of formula during a visit on June 22, 2011.

Meanwhile, the mother had been attending weekly individual therapy since February 2011, but the therapist reported the mother would not discuss her substance abuse issues. At the therapist's recommendation, the mother participated in a psychological evaluation in May 2011. The evaluator reported difficulty diagnosing the mother because she was "inclined either to deny that she ha[d] any problems in her life or to simply avoid discussion of those problems." The psychologist also opined that the mother's lack of distress suggested her work in recovery and reunification services might turn out to be superficial, and she may be "going through the motions rather than dealing with real issues."

4

The mother's other service providers reported she was doing well in parenting class and substance abuse programs. The mother had a part-time job and had started school to obtain a degree in business.

In November 2011, the mother graduated from drug treatment. She was also making better progress in therapy than in the first six months of services. The mother's therapist noted that her prevention plan was that she would not use drugs because that would mean that she would lose L.V.

By the time of the 12-month permanency review hearing on January 31, 2012, L.V. had moved from foster care to the home of her paternal aunt Sylvia S. Her medical and developmental needs were decreasing and she had graduated from physical therapy services.

The mother remained employed at the time of the 12-month permanency review hearing, but she had stopped attending school due to the amount of her student loan. She was living with the maternal grandmother who was involved in the original protective incident. The mother understood that she would need to obtain different housing in order to reunify with L.V. The court adopted the Agency's recommendation to continue reunification services for the mother to the 18-month permanency review hearing.

At the time of the 18-month permanency review hearing on July 3, 2012, L.V.'s developmental delays had improved, and she no longer had appointments scheduled for reassessment. The mother had successfully completed therapy. The therapist reported the mother was very compliant and was able to address the protective issues by remaining clean. The mother had continued attending her weekly NA meetings and had been

5

randomly drug tested twice with negative results. She had obtained her own apartment, continued to be employed at a clothing store, and was seeking a second job. L.V. was ordered placed with her mother on August 7, 2012.

C. *L.V.'s Second Removal*

A little over two months later, in October 2012, L.V. was again removed from the mother's custody. The Agency discovered the mother had moved out of the approved relative home of her maternal aunt in violation of her safety plan. Without notifying the Agency, she had moved back into the home of the maternal grandmother where L.V. had originally been removed. The worker met with the mother on October 22, 2012, and asked her to drug test. The mother tested positive for amphetamines and methamphetamine.

The mother's sister reported that she had observed the mother at the maternal grandmother's home on October 19, 2012, and believed she was under the influence of drugs on that day. On October 24, 2012, the maternal grandmother's roommate reported he was a recovering addict himself and believed the mother had been using drugs for over a month while staying in their home. Both the sister and the roommate reported seeing unknown men at the maternal grandmother's home while the mother was there.

When confronted with the positive drug test, the mother initially denied using drugs. She later admitted to using methamphetamine with a friend about five times on the morning of October 22, 2012. She stated she and her friend took turns smoking methamphetamine and caring for L.V. The mother subsequently failed to appear for two drug tests on October 25 and 26, 2012.

6

The mother did not schedule a visit with L.V. until 10 days after her October 25, 2012, removal. At one November 2012 visit, she failed to change the child's diaper and told the caregiver she was trying to teach L.V. to change her own diaper. At a subsequent November 2012 visit, she arrived nearly two hours late with a black eye, accompanied by a man who could not keep his eyes open and kept falling asleep.

At the contested adjudication and disposition hearing on the Agency's section 387 petition on January 16, 2013, the mother provided a letter from a lead treatment counselor indicating the mother had been a resident at KIVA inpatient drug and alcohol treatment program since December 24, 2012, and had tested negative for drugs on December 26, 2012. The court found that the mother's recent and belated entry into drug treatment was not sufficient to overcome the risk to L.V. if she were returned to the mother's care. The court made a true finding on the section 387 petition and removed L.V. from the mother's care by clear and convincing evidence. The court also terminated the mother's services and set a section 366.26 hearing. L.V. was placed back in the home of the relative caregivers who had cared for her prior to the mother's short period of reunification

D.      *The Mother's Section 388 Petition*

The mother filed her section 388 petition on June 19, 2013, a little over a month after the child's initial section 366.26 hearing on May 15, 2013. Her petition asked the court to place L.V. with her with family maintenance services or, in the alternative, to order a permanent plan of another planned permanent living arrangement and unsupervised visitation. The mother attached a third version of a relapse prevention plan to her petition. She also attached a letter to the judge expressing her embarrassment

7

about her relapse, her belief that she is an "awesome mother," and her determination to get her daughter back.

On June 25, 2013, the court heard prima facie arguments on the mother's section 388 petition at the pretrial settlement conference for the section 366.26 hearing. The court allowed her counsel to attach a letter from St. Vincent de Paul Village (St. Vincent), indicating the mother had been receiving room and board there for approximately one week. The court also permitted counsel to attach a completion letter from the KIVA residential drug and alcohol treatment program indicating the mother tested negative for drugs during her four-month stay and completed the program on April 22, 2013. The court also heard unsworn statements from mother's counsel regarding the mother's progress in aftercare and the services provided by St. Vincent. The mother's counsel indicated the mother had two unexcused absences and her participation in aftercare was not satisfactory due to nonpayment of fees. Mother's counsel also asserted the mother was participating in the sessions she did attend and had negative drug tests.

The court found the mother had not made a prima facie showing and summarily denied her section 388 petition. Specifically, the court found the mother's circumstances were changing, but had not changed. The court noted the mother had previously completed drug treatment and aftercare, knew her tools and triggers, and yet did not reach out to any member of her support group prior to her relapse. The court also noted the mother had a shorter period of sobriety and less time in stable housing at the time of her section 388 petition than she had the first time L.V. was returned to her. The court also found no prima facie showing of best interests to return L.V. to her mother.

8

E.      *The Section 366.26 Trial*

The contested section 366.26 hearing was held on July 11, 2013. The court received into evidence several Agency reports written by social workers Peter Ellew and Barbara Wojtach. The court also heard testimony from senior protective services worker Wojtach. Wojtach testified she had observed three visits by the time of the hearing. She observed an enjoyable relationship between the mother and LV. However, she did not observe L.V. seek out comfort and care from her mother. She also noted that L.V. interacted in the same manner with other relatives during a visit as she did with the mother. Moreover, L.V. had been excited to see Wojtach and hugged the social worker on only the second time the two saw each other. The mother's counsel had no questions for Wojtach.

Social worker Ellew observed approximately 14 visits during his assignment to the case. He assessed the bond between mother and daughter to be akin to a "fun relative." He also observed L.V.'s reaction to seeing her mother as similar to her reaction to seeing her aunt. For example, Ellew observed L.V. react excitedly to the presence of her aunt Alexandra V. and cry out "come here" when Alexandra tried to leave a visit. Ellew opined L.V. reacted this way because Alexandra was kind, playful, and gave her lots of attention. Moreover, L.V. was excited to see Ellew and showed affection to other nonrelatives, such as her day care provider.

Social worker Ellew believed adoption was in L.V.'s best interest based on her need for stability and consistency after many changes and disruptions in her life. He noted L.V. had only lived with the mother for a total of six months out of her almost 30

9

months of life and had been subjected to the mother's drug use, inconsistent supervision, and frequent moves. By May 2013, L.V. had lived with her current relative caregivers for 14 months. The parties had no questions for Ellew at the hearing.

The mother argued the continuing benefit exception applied to preclude adoption. The mother's evidence included visitation records from the Agency and the visitation center. The court also agreed to receive the visitation logs and the letter of completion of drug treatment which had been previously attached to the mother's section 388 motion. Finally, the mother offered stipulated testimony from the caregiver, Sylvia, that she would prefer to adopt L.V., but was also willing to become her legal guardian if the court so ordered.

At the close of evidence, the court found by clear and convincing evidence that it was likely L.V. would be adopted and that none of the exceptions set forth in section 366.26, subdivision (c)(1)(B) applied. The court terminated parental rights, selected adoption as L.V.'s permanent plan, and referred the matter to the Agency for adoptive placement.

## DISCUSSION

### I. *The Mother's Section 388 Petition*

The trial court denied the mother's section 388 petition because it found her circumstances were changing, but had not changed. The mother contends the court abused its discretion because she made the required prima facie showing. The Agency contends the court's findings did not demonstrate an arbitrary, capricious, or patently

10

absurd exercise of its discretion. We agree with the Agency and hold the court did not abuse its discretion.

A.    *Standard of Review*

Petitions under section 388 are construed in favor of their sufficiency. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461.) Thus, if a petition presents any evidence that a hearing would promote the best interests of the child, the court must order the hearing. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431-432.) The court may deny the application ex parte only if it fails to state a change of circumstance or new evidence that might require a change of order or termination of jurisdiction. (*Ibid.*)

The decision to grant or deny a section 388 petition is within the discretion of the juvenile court. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) Likewise, a summary denial of a section 388 petition is committed to the court's discretion. (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 460; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 808.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) " 'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272.) A reviewing court will not disturb the trial court's exercise of discretion unless the trial court's decision was arbitrary, capricious, or patently absurd. (*In re Stephanie M.*, at p. 318.)

"That another court might reasonably have reached a different result on this issue, however, does not demonstrate an abuse of discretion. An abuse of discretion may be

11

found only if ' "no judge could have reasonably reached the challenged result. [Citation.]" ' " (*O'Donoghue v. Superior Court* (2013) 219 Cal.App.4th 245, 269; see also *In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) The mother must affirmatively establish an abuse of discretion; it is never presumed. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423; *In re Marriage of Gonzalez* (1976) 57 Cal.App.3d 736, 749.)

B.      *The Court Did Not Abuse Its Discretion*

The mother has not met her burden to show the trial court's denial of her petition was arbitrary, capricious, or patently absurd. After the court returned L.V. to the mother's custody, the mother resumed smoking methamphetamine in very short order and did so while she had custody of L.V. She did so despite telling the court that her relapse prevention plan was staying sober so she would not again lose L.V. The mother exercised poor judgment when she left L.V. in the care of a person who she knew had been smoking methamphetamine so that the mother could also smoke the drug. Thus, despite past reassurances of compliance with services and treatment, she had shown she was unable to remain sober even when the stakes involved the loss of L.V.

At the time of the section 388 hearing, the mother presented no evidence that she was ready to assume custody of L.V. or provide suitable care for her. The court found the mother had less stable housing and less time in sobriety than the first time L.V. was returned to her. The record supports both of these findings. The mother had been in St. Vincent housing for approximately one week, and the organization's letter stated she would receive housing and services for only four months with no indication that she would be able to stay there for any longer period of time. As the mother had done in the

12

past when she needed housing, she was likely to return to the maternal grandmother's house, the location where L.V. was removed both times.  The record does not support any contention that the mother could have stayed at St. Vincent longer than four months.  Her sobriety period was also much shorter.  When the court returned L.V. the first time, the mother had been sober for approximately 18 months.  However, at the time of the section 388 hearing, she had been sober for less than eight months.  Moreover, while the mother had a job and was seeking a second job at the time of the hearing,  this fact did not constitute a changed circumstance because she had a job before the court returned L.V. to her.

In short, while the mother showed she had taken steps to change, she had not shown circumstances had changed such that a change of the court's order was possible. She had a shorter period of sobriety and only temporary housing.  Based on the facts before the court, we cannot say that " ' "no judge could have reasonably" ' " summarily denied the section 388 petition.  (See *O'Donoghue v. Superior Court, supra,* 219 Cal.App.4th at p. 269.)  The court did not abuse its discretion when it did so.

## II. *The Continuing Benefit Exception*

At the contested section 366.26 hearing, the court found the continuing benefit exception did not apply.  On appeal, the mother contends substantial evidence supports a finding that the continuing benefit exception applied because she shared a parental bond with L.V., who would continue to benefit from the relationship. We conclude that substantial evidence supports the court's findings.

13

A.      *Legal Background and Standard of Review*

Once a court determines a child is likely to be adopted, the burden shifts to the

parent to show that termination of parental rights would be detrimental to the child under

one of the exceptions listed in section 366.26, subdivision (c)(1)(B).  (*In re Zachary G.,*

*supra,* 77 Cal.App.4th at p. 809.)  An exception to the adoption preference applies if

termination of parental rights would be detrimental to the child because the "parents have

maintained regular visitation and contact with the child and the child would benefit from

continuing the relationship."[3]  (§ 366.26, subd. (c)(1)(B)(i).)

This court has interpreted the phrase " 'benefit from continuing

the . . . relationship' " to refer to a relationship that "promotes the well-being of the child

*to such a degree as to outweigh the well-being the child would gain in a permanent home*

*with new, adoptive parents*.  In other words, the court balances the strength and quality of

the natural parent/child relationship in a tenuous placement against the security and the

sense of belonging a new family would confer.  If severing the natural parent/child

relationship would deprive the child of a substantial, positive emotional attachment such

that the child would be greatly harmed, the preference for adoption is overcome and the

---

[3]      "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)  This led one court to remark that the continuing benefit exception "may be the most unsuccessfully litigated issue in the history of law. . . .  And it is almost always a loser." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5, disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.)

14

natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575, italics added.)

We have further noted that "[i]nteraction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

However, "[a] biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)

This "issue is subject to a sufficiency of the evidence standard of review." (*In re C.F.* (2011) 193 Cal.App.4th 549, 553; see also *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228; *In re Autumn H., supra,* 27 Cal.App.4th at p. 576.) " 'On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of

15

every reasonable inference and resolving all conflicts in support of the order.' " (*In re C.F.*, at p. 553.)

"We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H., supra*, 132 Cal.App.4th at p. 228.) "The judgment will be upheld if it is supported by substantial evidence, *even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.*" (*Ibid.*, italics added.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*Ibid.*)

B.      *Substantial Evidence Supports the Court's Findings*

Although it is clear that L.V. shared some sort of bond with the mother, substantial evidence supports the court's finding that their bond did not rise to the level of a beneficial parent-child bond.  The court found L.V.'s relationship with the mother was similar to the child's relationship with others in her life.  Indeed, although L.V. was excited to see the mother and showed her affection, she reacted in a similar manner to other family members like her aunt Alexandra, who was not her caregiver.  Moreover, L.V. showed affection to the two social workers assigned to her case and to her day care provider.  In fact, she reacted excitedly to Wojtach, who was a virtual stranger, on only the second time they had met and gave Wojtach a "big hug."  Clearly, L.V. is an outgoing and affectionate child who freely expresses her enthusiasm and affection.  However, the fact that she showed affection to the mother does not establish a *parental* bond.  It merely

16

establishes that L.V. has *some* bond with the mother—a bond that was no different than the bond L.V. shared with others in her life.

The parent must do more than demonstrate "frequent and loving contact[,]" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418 ) an emotional bond with the child, or that parent and child find their visits pleasant. (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) Instead, the parent must show that she occupies a "parental role" in the child's life. (*Ibid.*; see also *In re Beatrice M.*, at pp. 1418-1419.)

While L.V. and the mother had pleasant visits, and L.V. was sometimes sad to see the visits end, there is no bonding study or other evidence that showed the mother occupied a parental role in L.V.'s life, that she would suffer any actual detriment on the termination of parental rights, or that the benefits of continuing the parental relationship outweighed the benefits of permanent placement with family members who are ready to give her a permanent home. It is apparent that L.V. looks to the caregiver to fulfill her emotional and physical needs. For much of L.V.'s life, the caregiver had been the only adult who provided her with food, shelter, protection, and guidance on a regular basis. While the relationship between L.V. and the mother is pleasant to L.V., it is not the sort of consistent nurturing that marks a parental relationship. (Accord, *In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) A friendly relationship is "simply not enough to outweigh the sense of security and belonging an adoptive home would provide." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) The trial court properly concluded that the continuing benefit exception did not apply in this case.

DISPOSITION

The judgment is affirmed.


                                                          BENKE, Acting P. J.

WE CONCUR:


AARON, J.


IRION, J.

18