[No. A040908. First Dist., Div. Four. Apr. 7, 1989.]

In re the Marriage of DIANA L. and WARREN F. BRODERICK.
WARREN F. BRODERICK, Appellant, v.
DIANA L. BRODERICK, Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

494

COUNSEL

Robert A. Montgomery and Teal & Montgomery for Appellant Husband.

Catherine Ann Conner and Conner, Slabach & Lawrence for Appellant Wife.

OPINION

ANDERSON, P. J.—The appeal and cross-appeal at bench involve a dispute arising from the dissolution of marriage and determination of certain property rights of the parties. The pertinent facts leading to the controversy follow: Warren F. Broderick (husband) and Diana L. Broderick (wife) were married on January 17, 1970. They have two children: Ronald, born October 3, 1971, and Sheila, born June 6, 1975.

In October 1973 the parties purchased a family residence located at 701 St. Francis Drive, Petaluma, California. The price of the home was $23,500 which was financed by the spouses by making a down payment of $3,800

(which also included costs) and assuming a mortgage in the sum of $20,400 payable at the rate of $154 per month.

On September 8, 1977, wife executed a quitclaim deed transferring all her rights in the home to husband. At that time, the parties had separated and wife planned to move to Arkansas. Husband claimed to have paid wife $4,000 consideration for the quitclaim deed. The deed was prepared at a title company and was signed by wife in the presence of husband, the real estate broker and a notary public. The record indicates wife fully understood the legal consequences of the transaction, i.e., that by signing the deed she would give up all her rights in the family residence.

After the execution of the quitclaim deed and receiving the money therefor, wife left for Arkansas taking the children with her. Approximately 10 months later the parties reconciled and the family reunited in California. During the separation husband lived in the home and he made the monthly loan payments.

In November of 1979 the parties separated again. This time both husband and wife filed their respective petitions for dissolution of marriage in superior court. During this second separation, the home was occupied by husband and the children and, just as in the previous separation, the mortgage payments on it were made by husband without contribution from wife.

This separation ended in August 1980 when the spouses reconciled once more. They lived together until September 1985 when they separated for the final time. The evidence is uncontradicted that the mortgage payments on the home were paid with community funds while the parties stayed together between August 1980 and September 1985, but during the final separation lasting from September 1985 to February 1987, the loan payments were made with the separate funds of wife who was allowed to live in the home together with the minor children.

The parties stipulated that on the date of trial the fair market value of the residence was $82,500 with an existing loan balance of $12,000. They further stipulated that at the time wife signed the quitclaim deed the fair market value of the house was $45,000 with a loan balance of approximately $18,000.

Both in her pleading and the evidence presented at trial, wife contended that the family residence was community property and that the quitclaim deed should be set aside. While husband contended that the 1977 quitclaim deed transformed the residence to his separate property, he did concede that wife would be entitled to some community interest in the home pursuant to

*In re Marriage of Moore* (1980) 28 Cal.3d 366 [168 Cal.Rptr. 662, 618 P.2d 208] (hereafter *Moore*).

The trial court found that the residence constituted husband's separate property and that under *Moore* the community interest in the home was $52,593. Simultaneously, the court rejected wife's claim that the quitclaim deed at issue was invalid. Regarding the issue of whether husband was entitled to rental credit due to wife's occupancy of the residence after separation, the court ruled that such credit was owed to husband in the amount of $86 per month, which sum was to be deducted from the child support payment. From this judgment both parties appeal.

The primary issues on appeal and on cross-appeal are: (1) whether the residence was properly classified as husband's separate property; (2) whether the community interest in the home was to be determined under *Moore*; (3) whether the calculation of the extent of the community interest in the residence was accurate; and (4) whether the trial court erred in reducing the child support payment by the home rental value.

## I. *The Residence Was the Separate Property of Husband*

■ It is well recognized that a quitclaim deed is a distinct form of conveyance and operates like any other deed inasmuch as it passes whatever title or interest the grantor has in the property. (*Howard Homes, Inc.* v. *Guttman* (1961) 190 Cal.App.2d 526, 530 [12 Cal.Rptr. 244]; *Buller* v. *Buller* (1944) 62 Cal.App.2d 687, 699 [145 P.2d 649].) ■ It is equally settled that the form of the instrument creates a presumption that the title to the property is held as shown in the instrument. (*In re Marriage of Lucas* (1980) 27 Cal.3d 808, 813 [166 Cal.Rptr. 853, 614 P.2d 285] [superseded on other grounds by Civ. Code, § 4800.1]; *Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202, 212 [259 P.2d 656].) While the presumption arising from the form of the title may be rebutted by evidence of a contrary agreement between the parties, the presumption cannot be overcome solely by tracing the funds used to purchase the property, nor by testimony of an intention not disclosed to the grantee at the time of the execution of the conveyance. (*In re Marriage of Fabian* (1986) 41 Cal.3d 440, 446 [224 Cal.Rptr. 333, 715 P.2d 253].) Finally, it is axiomatic that the issue of whether the evidence is sufficient to overcome the presumption is a question of fact for the trial court whose determination will not be overturned on appeal if supported by sufficient evidence. (*Gudelj* v. *Gudelj, supra,* 41 Cal.2d at p. 212; *DeBoer* v. *DeBoer* (1952) 111 Cal.App.2d 500, 504-505 [244 P.2d 953].)

■ The trial court found here that the family residence was the separate property of husband. This finding is supported by the evidence. The record

shows that on September 8, 1977, wife executed a quitclaim deed by which she transferred to husband all her rights in the residence. The quitclaim deed was delivered to husband and was duly recorded in Sonoma County on September 13, 1977. Although the parties reconciled following the execution of the deed, the property was never retransferred to wife. Wife's trial testimony that in 1983 husband verbally promised to reconvey her share in the property was rebutted by: (a) the quitclaim deed itself; (b) evidence that in signing the quitclaim deed wife intended to give up all her rights with finality; and (c) husband's testimony and conduct indicating that ever since the execution of the 1977 deed he had considered and treated the family residence as his separate property. In sum, the alleged verbal agreement to reconvert the home into community property was founded on unsubstantiated, conflicting evidence which failed to overcome the presumption created by the deed and which the trial court was free to disregard.

Wife also claims that the quitclaim deed should have been set aside by the trial court on grounds of: (1) reconciliation of the parties; (2) duress; and (3) inadequate consideration. We find no merit in any of her contentions.

### A. *The Reconciliation of the Parties Did Not Cancel the Quitclaim Deed*

▇ Wife first contends that the quitclaim deed should have been held invalid because following its execution the parties reconciled which ipso facto annulled the deed. (*Lamb* v. *Lamb* (1955) 131 Cal.App.2d 489 [280 P.2d 793]; *Morgan* v. *Morgan* (1951) 106 Cal.App.2d 189 [234 P.2d 782].) This contention of wife lacks both legal and factual support.

▇ While it has been held that reconciliation and resumption of marital relations may cancel the executory provisions of *a property settlement agreement* (*Tompkins* v. *Tompkins* (1962) 202 Cal.App.2d 55, 59-60 [20 Cal.Rptr. 530]; *Harrold* v. *Harrold* (1950) 100 Cal.App.2d 601, 609 [224 P.2d 66]), it is well settled that proof of reconciliation alone does not abrogate the agreement (*Bluhm* v. *Bluhm* (1954) 129 Cal.App.2d 546, 550 [277 P.2d 421]). To avoid the contract on this basis, there must be a clear indication that by reconciling the parties intended to annul the agreement and restore their earlier property rights. Such intent can be proven, for example, by the destruction of the document containing the agreement, execution of reconveyances or restoration of the control of the property to one who formerly exercised it. (*Plante* v. *Gray* (1945) 68 Cal.App.2d 582, 588 [157 P.2d 421]; 33 Cal.Jur.3d, Family Law, § 529, p. 104.) This is particularly true where the parties have received or accepted the benefits of the settlement agreement. (*Bluhm* v. *Bluhm, supra,* 129 Cal.App.2d at p. 550; see also *Crossley* v. *Crossley* (1950) 97 Cal.App.2d 627 [218 P.2d

132].) At any rate, the issue of whether the parties intended to abrogate their property agreement by resuming their mutual marital responsibilities constitutes a factual determination and the finding of the trier of fact will not be overruled if supported by the record. (*Tompkins* v. *Tompkins, supra,* 202 Cal.App.2d at p. 59; see also *Morgan* v. *Morgan, supra,* 106 Cal.App.2d at p. 193.)

■ Here the evidence demonstrates that the execution of the quitclaim deed was not in contemplation of divorce; it constituted only a single, isolated property transaction which was not part of a property settlement agreement. Property settlement agreements address a wide range of marital disputes and generally include the division of *all* the community assets, including the personal property. They usually include the additional issues of child custody and support, spousal support, attorney fees, costs, etc.

But, even were we to assume that the 1977 quitclaim deed was part of a settlement agreement because it was executed in contemplation of separation, wife's contention still fails. The transfer of the residence was a completed deal (rather than an executory provision of a contract) and wife retained the consideration (i.e., the benefit of the bargain). Furthermore, the record does not establish that by reconciling, the parties intended to abrogate the deed. Although wife testified that following their reconciliation there was some discussion about a reconveyance of her share in the property, husband categorically denied that he had ever made such a promise. Moreover, there was no evidence of the deed's destruction, or of an execution of reconveyance or of restoration of wife's control over the property. In light of this evidence we are bound to sustain the trial court's finding that the reconciliation of the parties did not nullify the quitclaim deed. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Alderson* v. *Alderson* (1986) 180 Cal.App.3d 450, 465 [225 Cal.Rptr. 610].)

We briefly note *Lamb, supra,* and *Morgan, supra,* the primary authorities cited by wife, are distinguishable from these circumstances. In both *Lamb* and *Morgan,* there was a complete property settlement agreement between the parties which was incorporated in the interlocutory decree of dissolution. In addition, the appellate court in *Lamb* and *Morgan* upheld the trial court's finding of fact that, under the circumstances there present, the reconciliation was intended by the parties to void the property settlement agreement, including the quitclaim deeds executed by the husbands. In contrast herein, the trial court found otherwise, and based upon the record before us we cannot say that such finding is not supported by sufficient evidence.

## B. *The Record Does Not Support the Claim of Duress*

Wife next argues that the 1977 quitclaim deed should have been set aside because it was obtained by duress. We disagree.

It is well settled that a contract (or deed) may be set aside for duress only if it was " ' ". . . obtained by so oppressing a person by threats regarding the safety or liberty of himself, or of his property, or of a member of his family, as to deprive him of the free exercise of his will. . . ." ' " (*In re Marriage of Gonzalez* (1976) 57 Cal.App.3d 736, 743-744 [129 Cal.Rptr. 566]; see also *Gross* v. *Needham* (1960) 184 Cal.App.2d 446, 461 [7 Cal.Rptr. 664].) Duress "is more than mere threats or puffing; a party must be shown to have intentionally used threats or pressure *to induce action* or nonaction to the other party's detriment." (*In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1073, fn. 6 [202 Cal.Rptr. 116], italics added.)

Herein, wife testified that she signed the quitclaim deed because she wanted to leave husband and needed the money. The alleged violence on the part of husband took place a couple of months earlier; at the time of executing the document, husband exerted neither threats nor violence.[1] Thus, the record demonstrates beyond dispute that at the time of the execution of the deed wife's free will was not overcome by threats, fear or violence, and that she was not induced to sign the document under circumstances which destroyed her free agency and caused her to act against her will. (*Gross* v. *Needham, supra,* 184 Cal.App.2d at p. 461.) Given these facts, the trial court was justified in finding that wife did not sign the quitclaim deed under duress;[2] under well-settled rules of appellate review we assume in favor of this determination every fact which the trial court could have reasonably deduced from the evidence. (*In re Marriage of Gonzalez, supra,* 57 Cal.App.3d at p. 745; *Gross* v. *Needham, supra,* 184 Cal.App.2d at p. 460.)

---

[1] The wife's testimony reads in part: "Q. Now, with regards to the violence that you had— testified about earlier, there had been no violence between you and Warren [husband] for months prior to the time you signed the quitclaim deed in September of 1977, isn't that right? [¶] A. Yeah, about two months. [¶] Q. *At the time that you signed the quitclaim deed, Warren wasn't threatening you, was he?* [¶] A. *No, he wasn't holding a stick.*" (Italics added.)

[2] The finding in question states: "The Court rejects the argument as the facts fail to prove duress except in the context of wife apparently wanting and needing money because she was leaving for Arkansas. There was no testimony whatsoever that wife feared for her safety at the time of the execution of the deed; nor was there any showing that wife had asked husband for money to go to Arkansas and then was refused. To the contrary, husband apparently sent support money to Arkansas. . . ."

### C. *Inadequacy of Consideration Does Not Render the Deed Invalid*

■ Finally, wife claims that the quitclaim deed should have been invalidated on equitable grounds. (*In re Marriage of Moore* (1980) 113 Cal.App.3d 22 [169 Cal. Rptr. 619].) She complains that she received inadequate consideration inasmuch as husband paid only $3,000 in exchange for her half-interest in the home—an interest worth over $13,000 at the time of the execution of the deed.

■ ■ Wife's contention fails, because under well-settled statutory and case law inadequacy of consideration does not defeat the validity of a deed in the absence of fraud. (Civ. Code, § 1040;[3] *Odone* v. *Marzocchi* (1949) 34 Cal.2d 431, 436 [211 P.2d 297]; *Generes* v. *Justice Court* (1980) 106 Cal.App.3d 678, 683 [165 Cal.Rptr. 222]; *Taylor* v. *Taylor* (1944) 66 Cal.App.2d 390, 398 [152 P.2d 480].) ■ As stated in *Cambridge Co.* v. *Moore* (1943) 62 Cal.App.2d 134, 139 [144 P.2d 57]: "A consideration is not necessary to support a deed of real property if it has been executed voluntarily and with knowledge of its contents and with intent to convey title to the grantee." (Accord *Brown* v. *Fix* (1978) 86 Cal.App.3d 809, 813 [150 Cal.Rptr. 431].)

■ In the case herein, the record establishes that husband made no representations regarding the value of the home, nor did he make any promises to wife at the time of signing the deed. Wife understood the meaning and effect of the deed and, in exchange for the agreed upon consideration, she voluntarily transferred her title in the home to husband. Under these circumstances wife has neither legal nor equitable claim to the property which she knowingly and voluntarily parted with in return for a mutually agreed upon sum.

*In re Marriage of Moore, supra,* 113 Cal.App.3d 22, poses a strikingly different factual situation and, therefore, does not control the present case. In *In re Marriage of Moore,* the wife, a foreign citizen with inadequate command of the English language, waived her community interest in her husband's military pension without knowing that she had such a right and without understanding the meaning of the transaction. Those facts indeed called for an invocation of the trial court's inherent equitable power to annul the property settlement agreement by which husband took advantage of his unrepresented and ignorant wife. By contrast, wife here was fully aware of both her property right in the home and the legal effect of the quitclaim deed; thus, the conveyance was the result of an informed decision

---

[3] Civil Code section 1040 provides that "A voluntary transfer is an executed contract, subject to all rules of law concerning contracts in general; except that *a consideration is not necessary to its validity.*" (Italics added.)

on her part. Such, of course, justifies the denial of that equitable relief here sought.

## II. *The Trial Court Correctly Chose the Moore Formula in Ascertaining the Community Interest in the Family Residence*

■ The second major issue raised is whether the trial court erred in calculating the community interest in the residence under *Moore*. Husband now argues on appeal that the determination of the community interest should have been adjudicated under *In re Marriage of Stoner* (1983) 147 Cal.App.3d 858 [195 Cal.Rptr. 351], a case decided subsequent to *Moore*. In rebuttal, wife points out since, in the proceedings below, husband conceded that the interest in the house should be decided under *Moore,* he is bound by that concession and barred from raising this issue on appeal under the doctrines of invited error, estoppel, waiver and theory of trial. Wife's position is well taken.

■ It is settled that where a party by his conduct induces the commission of an error, under the doctrine of invited error he is estopped from asserting the alleged error as grounds for reversal. (*Abbott* v. *Cavalli* (1931) 114 Cal.App. 379, 383 [300 P. 67]; *Morris* v. *Frudenfeld* (1982) 135 Cal.App.3d 23, 32 [185 Cal.Rptr. 76]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 301, p. 313.) ■ Similarly, an appellant waives his right to attack error by expressly or implicitly agreeing or acquiescing at trial to the ruling or procedure objected to on appeal. (*Redevelopment Agency* v. *City of Berkeley* (1978) 80 Cal.App.3d 158, 166 [143 Cal.Rptr. 633]; 9 Witkin, Cal. Procedure, *supra,* §§ 305-307 at pp. 316-318.) ■ Finally, it is axiomatic that "A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715]; accord *In re Marriage of Karlin* (1972) 24 Cal.App.3d 25, 33 [101 Cal.Rptr. 240] [disapproved on other grounds in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851, fn. 14 (126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164)]; *Rickel* v. *Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 656 [192 Cal.Rptr. 732].) ■ Husband, however, relies on an exception to the general rule, that an issue not raised at trial may be presented for the first time on appeal when the issue involves purely a legal question which rests on an uncontraverted record which could not have been altered by the presentation of additional evidence. (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375 [584 P.2d 512]; *Wilson* v. *Lewis* (1980) 106 Cal.App.3d 802, 805 [165 Cal.Rptr. 396].)

The record herein is indisputably clear that in both his pretrial statement and at trial husband conceded that if the residence was found to be his

separate property, the court should determine the parties' community interest in the home pursuant to *Moore*.[4] By such acquiescence in the allegedly erroneous standard, husband is barred from raising for the first time here on appeal the error stemming from adjudication pursuant to that procedure. Husband fails to bring himself within the exception. *Stoner,* the new case relied on by husband, held that the community funds expended after the execution of the quitclaim deed constituted the wife's separate property because the *husband intended to make a gift* to the wife. (*In re Marriage of Stoner, supra,* 147 Cal.App.3d at p. 864.) By contrast, in the case here the crucial issue of whether the community payments made following the execution of the quitclaim deed were intended to be a gift to the separate property of husband, was neither raised, nor developed in the proceeding below. It follows that the suggested determination of the parties' community interest under *Stoner* would not pose a purely legal question, but would add a new factual dimension; the case could not then be resolved on appeal, since neither party introduced evidence concerning his or her interest in making community payments on the residence. The case thus is governed by *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534], where our Supreme Court stated: "[T]he opposing party should not be required to defend for the first time on appeal against a new theory that 'contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial.'" (Accord *Rickel* v. *Schwinn Bicycle Co., supra,* 144 Cal.App.3d at p. 656.)

### III. *The Calculation of Community Interest in the Home Was Erroneous*

■■■■ Using the *Moore* formula, the trial court found that the community interest in the residence was 74.6 percent, which equalled $52,593. This finding of the trial court is attacked by both parties. Wife contends that the trial court disregarded several factors in the *Moore* formula which, if properly applied, would have resulted in a higher percentage of community interest in the property totalling $63,582.69. Husband, on the other hand, claims that the trial court erred in including all the community contributions made between the purchase of the home in February 1973 and the date of trial in February 1987. He maintains that the contributions made

---

[4] The pertinent parts of the record read as follows: The husband's pretrial statement: "The major items of conmunity property to be divided by the parties are some interest in the [husband's] retirement plan and an interest in the [wife's] retirement fund. [¶] Additionally, the [*wife*] *would have some interest in the community residence pursuant to the holding in In re Marriage of Moore.*" (Italics added.)

Definition of the issues at trial: "[N]umber three, if the house is the husband's separate property, what are the credits that's [*sic*] wife's entitled to under the Moore decision. [¶] In other words, *we concede that* [*if*] *the house is separate property*[,] *she* [*the wife*] *does have credits pursuant to the Moore decision.*" (Italics added.)

with community funds should have been counted only from the date of the execution of the quitclaim deed on September 8, 1977; he claims the legal effect of the deed was to transfer all the interest of wife (including all her community interest accumulated to that date) to husband, the grantee under the deed. We agree with husband and remand the case for the limited purpose of redetermining the community interest in the residence.

 A quitclaim deed is used when the grantor intends to convey such an interest in the property as he or she has, in contradistinction to other deeds which grant fee or other estate with warranty of title. Under well-settled law, a quitclaim deed passes all the right, title and interest the grantor has in the property at the time of its execution, but it does not pass title or interest acquired by the grantor subsequent thereto. (*Howard Homes, Inc.* v. *Guttman, supra,* 190 Cal.App.2d at p. 530; *Helvey* v. *Coachella Valley Water Dist.* (1952) 108 Cal.App.2d 746, 747 [239 P.2d 702]; 26 Cal.Jur.3d, Deeds, §§ 290, 293, at pp. 598, 603.) As stated in *Buller* v. *Buller, supra,* 62 Cal.App.2d 687, 699: " 'A quitclaim deed is closely related to a simple release, but has come to be recognized as a distinct form of conveyance, and operates like any other deed to the extent of transferring whatever title or interest the grantor has, but none other . . . . A quitclaim deed, however, purports and operates to transfer only such interest as the one executing it then has, and hence does not carry an after-acquired title.' " (Accord *Klamath Land & Cattle Co.* v. *Roemer* (1970) 12 Cal.App.3d 613, 618 [91 Cal.Rptr. 112].) But even aside from the automatic legal effect of a transfer by quitclaim deed, the language of the deed here explicitly states that "It is the intention of the undersigned (wife) *to divest herself of any interest* in the above described property, *community or otherwise.*" (Italics added.)

It follows from the above discussion that by executing the quitclaim deed on September 8, 1977, wife transferred to husband *all* her interest in the home existing at that time which also included the community interest which had accrued up to that point as a result of paying down the loan principal with community funds. It is equally clear, however, that the community contributions made after the execution of the deed and after the parties reconciled, created an after-acquired community interest in the home which was unaffected by the prior quitclaim deed. The conclusion is thus inescapable that while the community contributions made prior to the execution of the quitclaim deed must be disregarded, those community payments to defray the loan principal made thereafter must be included in determining the parties' community interest in the residence.

In recalculating the community interest in the property the trial court is bound to follow the guidelines set forth in *Moore.* The controlling

principle is that where, as here, community funds are used to make loan payments on the separate property, the community receives a pro tanto community property interest in such property in the ratio that the payments with community funds bear to the payments made with separate funds. ■ This is calculated under a formula defined in *Moore* and developed in greater detail in *In re Marriage of Frick* (1986) 181 Cal.App.3d 997 [226 Cal.Rptr. 766]. Under this formula: "[O]ne first determines the separate property and community property percentage interest in the property. The separate property percentage interest is determined by crediting the separate property with the down payment and the full amount of the loan on the property less the amount by which the community property payments reduced the principal balance of the loan. This sum is divided by the purchase price. The resulting figure is the separate property percentage share. The community property percentage share is determined by dividing the amount in which community property payments reduced the principal by the purchase price. (*In re Marriage of Moore, supra,* 28 Cal.3d at pp. 373-374.) The separate property interest in the property as valued at the end of marriage is determined by adding all the prenuptial appreciation, the amount of capital appreciation during marriage attributable to the separate funds (determined by multiplying the capital appreciation during marriage by the separate property percentage interest), and the amount of equity paid by separate funds. (*In re Marriage of Marsden* [1982] 130 Cal.App.3d at pp. 437-439.) The community property share in the value of the property is determined by adding the amount of capital appreciation during marriage attributable to community funds to the equity paid by community funds." (*In re Marriage of Frick, supra,* at p. 1008.)

IV. *The Reduction of the Child Support Payment Was Correct**

. . . . . . . . . . . . . . . . . . . .

The case is remanded to the trial court in order to redetermine the parties' community interest in the residence consistent with the views expressed herein; in all other respects the judgment is affirmed.

Perley, J., concurred.

POCHÉ, J.—I fully concur in parts II, III, and IV, of the lead opinion, and I reluctantly agree in result in part I.

At trial this was obviously a very close case. The evidence showed that at the time of the execution of the quitclaim deed, wife had a tenth grade

---

*See footnote, *ante,* page 489.

education, did not have a bank account and had never held a job. During the marriage, husband had paid all the bills, purchased the groceries, and prepared the tax returns. It was husband who had negotiated the purchase of the family residence, dealt with the real estate agent and title insurance people. When wife decided to separate from husband and move to Arkansas, she signed the quitclaim deed because husband had offered her $3,000.[1] In wife's words, "I put it in his name so I could have the money." "I was in an awful hurry." After the reconciliation in Arkansas some 10 months later, the expenses of the car trip home with husband were paid from wife's $3,000.

When wife signed the deed she understood that she was giving up her interest in the house, but she had no idea what interest (50 percent) she had or what value the house had (some $45,000 minus an existing loan of $18,000). However, husband never misrepresented to her the value of the house; he made no representations whatsoever. Wife never thought to ask about the value of her entitlement to the property: some $13,500.

On appeal the task of the judge is much more limited. On this record, I can find evidence sufficient to support the trial court's finding that there was no duress or fraud in the transaction. I also agree that the reconciliation by its own force does not nullify the deed especially in light of husband's testimony, obviously credited by the trier of fact, that the parties did not intend to nullify the deed by their reconciliation. Nevertheless I continue to have serious doubt that this transaction is legally conscionable: a quick three (or four) thousand dollars in exchange for an equity interest having at least triple that value.

---

[1] Husband believed he paid closer to $4,000; the trial court never resolved that factual dispute.