[No. A057389. First Dist., Div. One. July 23, 1993.]

ROBIN R. MOERMAN, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

454

### COUNSEL

Ronald A. Zumbrun, Robin L. Rivett, Brad W. Dacus and Jennifer M. Deming for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Walter E. Wunderlich, Assistant Attorney General, Charles W. Getz IV and Mary E. Hackenbracht, Deputy Attorneys General, for Defendants and Respondents.

### OPINION

**DOSSEE, J.**—Plaintiff Robin R. Moerman alleged the state had damaged his property by relocating tule elk which were destroying his fences and

eating the forage intended for his livestock. The trial court granted the state's motion for summary judgment. On appeal, Moerman contends the trial court erred, and that as a matter of law, there has been a taking of his property.

We find the tule elk are not instrumentalities of the state nor controlled by the state, and, therefore, there has been no physical taking of Moerman's property. We will not consider Moerman's regulatory taking argument because he did not advance it in the trial court. We affirm the judgment.

### BACKGROUND

In the 1970's, in accord with legislative direction (Stats. 1971, ch. 1250, § 2, p. 2458; see Fish & G. Code, § 3951), the State Department of Fish and Game (DF&G) began a program of relocating tule elk to their native ranges. As part of this program, in 1978 through 1980, the DF&G relocated tule elk from the Owens Valley close to Lake Pillsbury in Lake County. Historically, tule elk could be found all over the state including Lake and Mendocino Counties, but by 1870 the animal was nearly extinct in California and could then be found only in Kern County. Protection of the elk and the efforts of the DF&G enabled the elk to recover somewhat so that by the late 1980's the elk population had increased to over 2,500.

In the winter of 1984, Moerman noticed tule elk on his 200-acre ranch in Potter Valley in Mendocino County. He observed just under 50 elk on his property at that time. Because the elk were eating crops meant for his livestock and damaging fences, he notified the DF&G and eventually filed a claim for damages. According to Moerman, the elk have remained on his property almost continuously since 1984 and their numbers have increased.

The majority of the tule elk in Potter Valley were elk released near Lake Pillsbury, approximately 14 miles away. The DF&G has attempted to scare the elk off private property in response to complaints from landowners, including Moerman, but the DF&G's efforts apparently have been unsuccessful, at least in Moerman's case. The DF&G has removed some elk from Potter Valley and allowed limited hunting of the elk.

On November 17, 1988, Moerman filed a complaint in Mendocino County Superior Court seeking damages and an injunction enjoining the DF&G from allowing the tule elk to invade his property. He filed an amended complaint in May 1991 alleging, inter alia, that the state[1] was responsible for the presence of tule elk on his property, which interfered with the use and

---

[1]The named defendants in the amended complaint were the State of California and the Director of the DF&G. For the sake of simplicity, we will refer to the defendants as the state.

enjoyment of his property and amounted to a taking of his property. He asserted the damage to his property exceeded $74,000, and that the value of his property had been reduced by over $20,000.

The state moved for summary judgment contending it was not responsible for property damage caused by wildlife. The trial court agreed, finding that the tule elk were wild animals, that the DF&G had exercised no control over them since their relocation, and that the relocation did not change their status as wild animals. The court concluded that Moerman could not state a claim for inverse condemnation.

Moerman appeals from the judgment entered against him.

### Discussion

#### I. *Standard of Review*

A motion for summary judgment shall be granted if there are no triable issues of fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

Moerman submits there are no triable issues of fact, but, he argues, the trial court did incorrectly apply the relevant law. He asserts that based on the undisputed facts, there was a taking of his property under the Fifth Amendment of the United States Constitution or article I, section 19 of the California Constitution.[2]

Our task is to review the facts presented below, independently determine their effect as a matter of law and independently review the trial court's determination of questions of law. (*Buic* v. *Buic* (1992) 5 Cal.App.4th 1600, 1604 [7 Cal.Rptr.2d 738].)

#### II. *Physical Taking of Moerman's Property*

Moerman contends the state has physically occupied his property by transplanting the tule elk which are now invading his property. He concedes that courts have generally held the government is not responsible for damages caused by wild animals, but he asserts that in this case the state has "exhibited" control or possession of the elk, and, therefore, the state is responsible for the damage caused by the elk.

---

[2]The pertinent part of the Fifth Amendment of the United States Constitution provides: "[N]or shall private property be taken for public use, without just compensation."

The pertinent part of article I, section 19 of the California Constitution provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. . . ."

■ Takings of private property are generally divided into two categories: Those where government activities result in a physical invasion of property, and those where the government merely regulates the use of the property. "Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation." (*Yee* v. *City of Escondido, Cal.* (1992) 503 U.S. __, __ [118 L.Ed.2d 153, 162, 112 S.Ct. 1522, 1526].) ■ In arguing that the state has physically occupied his property through the tule elk, Moerman relies on the United States Supreme Court's decision in *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164], and on decisions from this state in which a taking was found when a public project caused damage to private property (see e.g. *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285 [142 Cal.Rptr. 429, 572 P.2d 43]; *Aetna Life & Casualty Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 865 [216 Cal.Rptr. 831]).

In *Loretto* v. *Teleprompter Manhattan CATV Corp.*, *supra*, the Supreme Court considered a landlord's claim that her property had been taken without just compensation when a cable television company installed its equipment on her property, under the authority of a law that required landlords to permit the installation of such equipment. The equipment consisted of cable and two metal boxes placed on the roof of the landlord's building.

■ The Supreme Court explained that government action which results in a permanent physical occupation of private property is invariably a taking and is not subject to a balancing process.[3] (*Loretto* v. *Teleprompter Manhattan CATV Corp.*, *supra*, 458 U.S. at p. 432 [73 L.Ed.2d at p. 880].) The court declined to draw a distinction between a physical invasion by the government, versus an invasion by a third party authorized by the government. (*Id.* at p. 432, fn. 9 [73 L.Ed.2d at p. 880].) The court concluded the cable television installation placed on the landlord's building constituted a taking. (*Id.* at p. 438 [73 L.Ed.2d at p. 880].)

■ The distinction between tule elk and cable television personnel or equipment should be obvious. The tule elk are wild animals who roam across private and public property. The state does not own wild animals (*People* v. *Brady* (1991) 234 Cal.App.3d 954, 958-959 [286 Cal.Rptr. 19]), nor does it control wild animals that have not been reduced to possession (*Christy* v.

---

[3]In contrast, a complex factual assessment and balancing of interests is necessary to determine whether compensation is required when the government merely regulates the use of property. (*Yee* v. *City of Escondido, Cal.*, *supra*, 503 U.S. at p. __ [118 L.Ed.2d at p. 162; 112 S.Ct. at p. 1526]; *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648, 98 S.Ct. 2646].) See part III, *post*.

*Hodel* (9th Cir. 1988) 857 F.2d 1324, 1335; *Mountain States Legal Foundation* v. *Hodel* (10th Cir. 1986) 799 F.2d 1423, 1426). The majority of courts that have considered the question of whether the government owes compensation for damage to property caused by protected wildlife have held that the government does not. (See *Christy*, at p. 1334, and cases cited therein.)

Moerman points to the facts that the tule elk were once captured and that their movements are now monitored, but this falls far short of demonstrating control of the elk, or that the elk are something other than wild animals. The elk originally captured and released at Lake Pillsbury were held only for a day. The state's involvement with the elk now living in Potter Valley has been limited to monitoring their movements through ear tags and radio collars, and attempting to move them off private property when a property owner complained.[4] The DF&G prepared a plan in 1988 for the "Mendocino Tule Elk Management Unit" that anticipated management of the elk through continued monitoring, habitat improvement carried out in cooperation with landowners, sport hunting, and relocation of elk if necessary. Nothing in this plan nor in the remainder of the record shows the state controls the elk.

This absence of control also renders the California authority upon which Moerman relies inapplicable. ■ The doctrine set forth in this authority has been summarized as follows: "Article I, section 19 (formerly art. I, § 14) of the California Constitution requires that just compensation be paid when private property is taken or damaged for public use. Therefore, a public entity may be liable in an inverse condemnation action for any physical injury to real property proximately caused by a public improvement as deliberately designed and constructed, whether or not that injury was foreseeable, and in the absence of fault by the public entity. [Citations.]" (*Souza* v. *Silver Development Co.* (1985) 164 Cal.App.3d 165, 170 [210 Cal.Rptr. 146]; *Marshall* v. *Department of Water & Power* (1990) 219 Cal.App.3d 1124, 1138 [268 Cal.Rptr. 559].)

Thus, public entities have been required to pay for damage to private property caused by noxious odors from a city sewage plant (*Varjabedian* v. *City of Madera, supra,* 20 Cal.3d 285), fire started by city power lines (*Marshall* v. *Department of Water & Power, supra,* 219 Cal.App.3d 1124; *Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d 865), and flood waters diverted by a highway and its associated flood control works (*Sutfin* v. *State of California* (1968) 261 Cal.App.2d 50 [67 Cal.Rptr. 665]).

■ Moerman's attempt to analogize tule elk to a public improvement is misguided. Historical reports indicate that at one time there were approximately 500,000 tule elk in this state, inhabiting essentially all oak woodland

---

[4] In one instance, the DF&G responded to landowner complaints by capturing and relocating 12 elk to another county.

and oak grassland habitat, including Lake County and eastern Mendocino County. The fact that the state has chosen to return some of the animals to their native habitat does not mean it caused Moerman's damages. (See *Barrett* v. *State* (1917) 220 N.Y. 423 [116 N.E. 99, 101-102] [state not responsible for damages to private property caused by relocated beavers].) Clearly it is unreasonable to argue that because the animals were once eliminated from Lake and Mendocino Counties and driven to the brink of extinction, that they are now nothing more than a public improvement or pet, under the control of the state.

■ "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." (*Yee* v. *City of Escondido, Cal., supra*, 503 U.S. at p. __ [118 L.Ed.2d at p. 164, 112 S.Ct. at p. 1528], italics in original.) ■ While as a practical matter it may be difficult for Moerman to exclude the tule elk from his property without harming them, the state is not requiring him to submit to the occupation. (See *Mountain States Legal Foundation* v. *Hodel, supra*, 799 F.2d at p. 1428, fn. 8.) The management plan prepared by the DF&G indicates that some hunting of the elk will be allowed (see Fish & G. Code, §§ 332, 3951), which would possibly provide Moerman with opportunities to mitigate the damage to his property. Ultimately, however, there has been no physical taking of Moerman's property as the tule elk are not instrumentalities of the state nor are they controlled by the state.

## III. *Regulatory Taking of Moerman's Property*

■ Moerman contends the state has effected a regulatory taking of his property by relocating the tule elk and then depriving him of any reasonable means of protecting his property. The state notes this theory was not raised below.

The DF&G has conducted its elk relocation program pursuant to a mandate from the state Legislature. (Fish & G. Code, § 3951.)[5] The hunting of tule elk is strictly regulated by the state. (§ 332; Cal. Code Regs., tit. 14, § 364.5.) Courts faced with claims that a taking has occurred as a result of an invasion by wild animals have typically employed a regulatory taking analysis. (See e.g. *Christy* v. *Hodel, supra*, 857 F.2d at p. 1334 [Endangered

---

[5]Fish and Game Code section 3951 states: ". . . The department shall relocate tule elk in areas suitable to them in the State of California and shall cooperate to the maximum extent possible with federal and local agencies and private property owners in relocating tule elk in suitable areas under their jurisdiction or ownership. . . ."

Section 3951 further provides that when the elk cause damage, the department should work with landowners to manage the elk herds through hunting, relocation, or other appropriate means.

Species Act and regulations forbid killing of grizzly bears]; *Mountain States Legal Foundation* v. *Hodel, supra,* 799 F.2d at p. 1430 [Wild Free-Roaming Horses and Burros Act protects wild horses and burros]; *Platt* v. *Philbrick* (1935) 8 Cal.App.2d 27, 31 [47 P.2d 302] [Fish & G. Code limited hunting of wild game on Monterey Peninsula]; *Collopy* v. *Wildlife Com'n, etc.* (Colo. 1981) 625 P.2d 994, 1000-1002 [state regulations prohibited hunting of waterfowl]; *State* v. *Herwig* (1962) 17 Wis.2d 442 [117 N.W.2d 335, 338-340] [same].) .

After summarily rejecting the plaintiffs' contention that grizzly bears were government agents who had physically taken plaintiffs' property, the court in *Christy* v. *Hodel, supra,* explained: "The defendants properly focus on the regulations, promulgation of which constituted governmental action. The regulations themselves, however, do not purport to take, or even to regulate the use of, plaintiffs' property. The regulations leave the plaintiffs in full possession of the complete 'bundle' of property rights to their sheep. Perhaps because plaintiffs recognized this fact, they choose to focus on the conduct of the bears. Undoubtedly, the bears have physically taken plaintiffs' property, but plaintiffs err in attributing such takings to the government." (*Christy* v. *Hodel, supra,* 857 F.2d at p. 1334.)

Perhaps because Moerman recognized that taking claims based on acts by wild animals have rarely met with success, Moerman restricted his argument below to his contention that damage to his property resulted in a taking under the California Constitution. (See, i.e., *Varjabedian* v. *City of Madera, supra,* 20 Cal.3d 285.) He did not present a regulatory taking argument in the trial court, and in fact, he only tangentially asserted a taking under the federal Constitution.

█ "It is well settled that a party to a trial court proceeding is not permitted to change his position and offer a new theory of the case on appeal. [Citation.]" (*Rickel* v. *Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 655 [192 Cal.Rptr. 732].) Possible theories not fully developed in or factually presented to the trial court cannot create a triable issue. (*Robinson* v. *Hewlett-Packard Corp.* (1986) 183 Cal.App.3d 1108, 1127 [228 Cal.Rptr. 591].) While an appellate court may consider an issue not raised below when it involves purely a question of law (*In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 501 [257 Cal.Rptr. 397]), this exception does not apply here.

█ As noted in footnote 3, *ante,* a complex factual assessment and balancing of interests is required in order to determine whether a regulatory taking has occurred. Broadly stated, the analysis examines the purpose of the

regulation and the economic effect on the property owner. (*Yee* v. *City of Escondido, Cal.*, *supra*, 503 U.S. at p. __ [118 L.Ed.2d at p. 162, 112 S.Ct. at p. 1526]; *Penn Central Transp. Co.* v. *New York City*, *supra*, 438 U.S. at pp. 123-124 [57 L.Ed.2d at pp. 647-648].)

The trial court was never asked to perform this analysis, nor was the state ever obligated to present evidence on, or refute, a regulatory taking theory. The possibility of a regulatory taking was not expressly raised in Moerman's complaint, and even if it were raised implicitly, Moerman clearly abandoned the issue. (See *Robinson* v. *Hewlett-Packard Corp.*, *supra*, 183 Cal.App.3d at p. 1127.) The record before this court is insufficient to review a regulatory taking claim as Moerman "did not bring the relevant factual situation sufficiently into controversy." (*Rickel* v. *Schwinn Bicycle Co.*, *supra*, 144 Cal.App.3d at p. 656.)

Moerman points out that in *Yee* v. *City of Escondido, Cal.*, *supra*, 503 U.S. at page __ [118 L.Ed.2d at pp. 169-170, 112 S.Ct. at p. 1532], the Supreme Court agreed to consider a regulatory taking argument even though it was unclear whether the argument had been raised below. *Yee*, however, involved only a facial challenge to a rent control ordinance. The Supreme Court stated that once a federal claim was properly presented, it would not limit the parties to the precise arguments raised below. (*Ibid.*) Nevertheless, the court ultimately did not consider the petitioners' regulatory taking question because it had not been raised in the petition for certiorari. (503 U.S. at p. __ [118 L.Ed.2d at pp. 170-172].)

The procedure followed by the Supreme Court in *Yee* does not apply here. Moerman is asserting a regulatory taking as applied to his property, he arguably did not present a proper federal claim below, and it is the policy of the courts of this state not to consider new theories or arguments on appeal.

The judgment is affirmed.

Newsom, Acting P. J., and Stein, J., concurred.

A petition for a rehearing was denied August 18, 1993, and appellant's petition for review by the Supreme Court was denied October 21, 1993.