636 So.2d 761 (1994)
FLORIDA GAME AND FRESH WATER FISH COMMISSION, Appellant,
v.
FLOTILLA, INC., a Florida corporation, Appellee.
No. 93-00554.
District Court of Appeal of Florida, Second District.
March 16, 1994.
Rehearing Denied May 27, 1994.
*762 Robert A. Butterworth, Atty. Gen., and Denis Dean, Chief, Sp. Projects, Tallahassee, for appellant.
James V. Antista, Gen. Counsel, Florida Game and Fresh Water Fish Commission, Tallahassee, for appellant.
Kenneth B. Wright, Sierra Club Legal Defense Fund, Tallahassee, for Sierra Club, Friends of the Bald Eagle, Inc., Nat. Wildlife Federation, FL Wildlife Federation, Environmental Defense Fund, and Nat. Audubon Soc., amicus curiae, for appellant.
*763 Patrick Kennedy, Legal Asst., FL Audubon Soc., for FL Audubon Soc., amicus curiae, for appellant.
Thomas W. Reese, St. Petersburg, for ManaSota-88, Inc., amicus curiae, for appellant.
Caleb J. Grimes, Grimes, Grimes, Goebel, Grimes & Hawkins, P.A., Bradenton, for appellee.
FRANK, Chief Judge.
This appeal originated in a nonfinal order imposing liability upon the Florida Game and Fresh Water Fish Commission based upon an inverse condemnation claim asserted by Flotilla, Inc. pursuant to Article X, Section 6(a) of the Florida Constitution.[1] We reverse.
In September 1984, Flotilla, Inc. purchased 173 acres of undeveloped land for $3,000,000 to develop a residential subdivision in six phases. Prior to closing, Flotilla conducted environmental impact studies to determine the feasibility of its proposal. At that point, Flotilla had received from the City of Bradenton approval of its preliminary development plan and subdivision plat. Construction began in May 1987 and progressed unimpeded until November 1987, when a bald eagle's nest was discovered in a tree situated within the project's fourth phase. Within a month, in response to an anonymous report that the nest had either fallen or been knocked from its tree, officials from the Florida Game and Fresh Water Fish Commission arrived to investigate possible criminal violations of state and federal statutes that render unlawful the molestation or harassment of the bald eagle or its habitat.[2] Everyone was ordered off the property and the area around the tree was cordoned off with crime scene tape. Flotilla, however, "whether out of ignorance, negligence, criminal intent or simply forlorn hope that the noise would discourage the [eagles from] rebuilding," continued to develop its property. When, despite this activity, the eagles reestablished their nest, Flotilla, under threat of criminal prosecution, ceased further development within 750 feet of the nesting tree until the eagle activity abated. The magnitude of this so-called "zone of preservation" derives from the Habitat Management Guidelines for the Bald Eagle in the Southeast Region, a federal government publication that endorses buffer zones measuring up to 1500 feet around active eagle nesting sites.
Shortly after the discovery of the first nest, another, partially constructed eagle's nest was found on the project near phases five and six; accordingly, a second preservation zone of comparable dimension was established. Subsequently, Centex Homes, a residential contractor that had already purchased the project's first and second phases, expressed an interest in purchasing phases five and six. Centex contacted the Commission to inquire whether the wildlife management guidelines would affect its plans to build homes in that area. In March 1990, the Commission notified Centex that since no eagle activity on that site had been confirmed, a protective zone was no longer required. Centex bought the property. With regard to the nesting site affecting phase four, the restrictions continued until January 1993, when inspectors from the Commission concluded that the eagles had abandoned their nest. Significantly, each phase of the project, except for the 24 acre preserve on phase four, was eventually sold to private contractors, although some at prices less than what Flotilla had hoped for.
On July 2, 1990, seeking relief for having been "ousted from possession and control" of its property, Flotilla filed an inverse condemnation action against the Commission, the *764 State of Florida,[3] and the City of Bradenton. A bench trial was held and the court found the Commission, but not the City, liable for "taking" approximately 48 acres comprising the two habitat preserves and for causing construction delays that had virtually eviscerated the market value of the entire project. Although the trial court declared the confiscation "an actual physical taking," its analysis reflects that a regulatory taking occurred:
The taking in this case is not a regulatory taking. The best description is perhaps an "environmental taking." The combination of the State's criminal penalties and the Guidelines[] amounted to two of the three prongs of the State activity necessary for this taking. However, these laws and procedures pre-existed the Plaintiff's purchase of land, plan approvals, commencement of construction, borrowing of money, and the rest of the development activity before November 1987. The last prong, the element that is usually supplied by a governmental body in a regulatory taking, namely the passage of some legislative action which destroys the owners use of the property, was, in this instance, supplied by the birds, not the legislature. That was the selection of the land on which to nest. By Administrative Regulation and Criminal Statute, together with the Guidelines, the State effectively created a habitat for the eagles, and empowered the eagles to decide which land would be taken.
There was no physical taking in this case. That type of taking, generally deemed "per se," occurs only when the government "requires the landowner to submit to the physical occupation of his land." Yee v. City of Escondido, Cal., ___ U.S. ___, ___, 112 S.Ct. 1522, 1528, 118 L.Ed.2d 153 (1992). The government physically occupies property when it permanently deprives the owner of his "bundle" of private property rights, including the right to possess and dispose, as well as the right to prevent the government from using the occupied area. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982). As a factual matter, Flotilla lost neither the right to possess nor convey the affected areas, and further retained the right to use the property in any way that would not disturb the eagles' natural habitat. Certainly the government was not possessed of the property. This case is more truly characterized by the fact-intensive inquiry the law associates with regulatory takings rather than physical takings. Cf., Moerman v. State, 17 Cal. App.4th 452, 21 Cal. Rptr.2d 329 (1st Dist. 1993) ("Courts faced with claims that a taking has occurred as a result of an invasion by wild animals have typically employed a regulatory taking analysis").
Regulation is analyzed in terms of the exercise of the government's police power, and although regulation prompted by that police power will always interfere to some extent with private property rights, compensation must be paid only when the interference deprives the landowner of substantial economic use of his property. Joint Ventures, Inc. v. Dept. of Transp., 563 So.2d 622 (Fla. 1990). To facilitate this inquiry, and to assist the courts in deciding whether legitimate restriction encroaches too far, our supreme court has identified the following six factors to be considered in each "taking" case:
1. Whether there is a physical invasion of the property.
2. The degree to which there is a diminution in value of the property. Or stated another way, whether the regulation precludes all economically reasonable use of the property.
3. Whether the regulation confers a public benefit or prevents a public harm.
4. Whether the regulation promotes the health, safety, welfare, or morals of the public.
5. Whether the regulation is arbitrarily and capriciously applied.
6. The extent to which the regulation curtails investment-backed expectations.
Graham v. Estuary Properties, Inc., 399 So.2d 1374, 1380 (Fla. 1981), cert. denied sub nom, Taylor v. Graham, 454 U.S. 1083, 102 *765 S.Ct. 640, 70 L.Ed.2d 618 (1981). We have no doubt that in finding a taking the trial court assessed these factors. We have observed, for example, that the trial court correctly determined that protecting environmentally endangered species is a valid concern within our state's police power, one that "is generally beneficial to the welfare and quality of life of the people of the State of Florida." See, e.g., Moorman v. Dept. of Community Affairs, 626 So.2d 1108 (Fla. 3d DCA 1993). But after careful review, we have resolved that in two pivotal respects the Commission's actions do not elevate to a compensable wrong.
First, the court found that the Commission's use restrictions deprived Flotilla of most if not all of its interests in the property. The court overstates the matter. The testimony of Flotilla's president indicates that builders purchased every phase of the project, with the limited exception of a part of phase four.[4] Certain redesigning was necessary, and certain projects, such as a recreation area, had to be scaled down, but Flotilla managed to complete its plans for phases one, two and three, and to find buyers for phases four, five and six. Flotilla argued that the Commission devastated its investment by prohibiting it from developing the property in the manner it desired, but in the context of "takings" law, property owners do not achieve their burden "simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 130, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978); see also, Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (The "loss of future profits ... provides a slender reed upon which to rest a taking claim").
Second, the trial court set out the affected portions of Flotilla's property along side the periods of deprived use. The record bears out that of the undivided whole, about 48 acres were subject to regulation. Prohibition of development on certain portions of a tract does not, however, amount to an unconstitutional taking. See State, Dept. of Environmental Regulation v. Schindler, 604 So.2d 565, 568 (Fla. 2d DCA), rev. denied, 613 So.2d 8 (Fla. 1992); Fox v. Treasure Coast Regional Planning Council, 442 So.2d 221 (Fla. 1st DCA 1983). Similar frustrations of a landowner were addressed in Penn Central in which the Supreme Court rejected the owner's contention that application of a historical landmarks preservation law effected a taking of part of his property. According to Penn Central, "`[t]aking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." 438 U.S. at 130-31, 98 S.Ct. at 2662. Thus, in deciding whether government effects a taking, the focus is on the extent of the interference with the landowner's rights in the property as a whole, not merely the affected portions. Schindler, 604 So.2d at 568; Fox, 442 So.2d at 225. On this point Graham v. Estuary Properties is instructive. In Graham, our supreme court held that the denial of a permit to destroy 1800 acres of protected mangroves, leaving the landowner with 2800 acres and reducing by half the number of housing units the owner intended to build, was not compensable. By comparison, Flotilla retained the desired use of the majority of its land; most of the property was developed. Because the property as a whole retained an economic life, we cannot agree that the land use restrictions are compensable.
The trial court's observation that, in enforcing the laws protecting endangered species, the Commission "empowered the eagles to decide which land would be taken," is meaningless and does not aid the result reached by that court. The government neither owns nor controls the migration of the wildlife species it protects. Rather, the government merely employs its police power "to conserve and protect these [endangered and threatened] species as a natural resource." See § 372.072(2), Fla. Stat. (1989). Of the few courts that have encountered this question, *766 most agree that government owes no compensation for and may constitutionally protect wildlife whose unwanted occupation on private land arguably diminishes the market value of that land. See, e.g., Christy v. Hodel, 857 F.2d 1324 (9th Cir.1988) (no taking occurs when government prevents landowner from protecting his sheep by shooting marauding grizzly bears), cert. denied, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989); Mountain States Legal Foundation v. Hodel, 799 F.2d 1423, 1426 (10th Cir.1986) (damage to private lands caused by legally protected wild horses did not constitute taking, even though grazing habits of animals had diminished value of property), cert. denied, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987); Moerman v. State, 17 Cal. App.4th 452, 21 Cal. Rptr.2d 329 (1st Dist. 1993) (in preventing landowner from disturbing protected tule elk on his property, the state was not requiring him to submit to government occupation); Seven Islands Land Co. v. Maine Land Use Regulation Com'n., 450 A.2d 475 (Me. 1982) (protective zone on portion of timberlands is constitutional means of protecting deer herd); Leger v. Louisiana Department of Wildlife and Fisheries, 306 So.2d 391 (La. Ct. App.) (state has no duty to control movement of species or prevent it from damaging private property), writ denied, 310 So.2d 640 (La. 1975). In view of the vital public interest served, and the fact that the restrictions on development were limited to portions of an undivided parcel, we conclude that Flotilla's property was not inversely condemned.
Accordingly, we reverse.
RYDER and PATTERSON, JJ., concur.
NOTES
[1] That section of the constitution provides:

No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner.
[2] The bald eagle enjoys federal protection as an endangered species under the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1543 (1982 & Supp. 1984), and the Bald Eagle Protection Act, 16 U.S.C. §§ 668-668d (1982). In Florida, the bald eagle is designated a threatened species pursuant to the Endangered and Threatened Species Act of 1977, and interference with its habitat constitutes a third degree felony. See § 372.0725, Fla. Stat. (1989); Rules 39-27.002 & .004, Florida Administrative Code.
[3] The State was dismissed from the cause prior to trial.
[4] In 1992, Centex offered $400,000 to purchase the property forming the phase four preserve. The RTC, in possession of the failed institution that had financed Flotilla's acquisition and development, would not approve the sale.